Argued April 1, affirmed May 27, 1953

GAMBLE ET UX. *v.* BEAHM
BEAHM *v.* GAMBLE ET UX.
257 P. 2d 882

*Frank E. Day* argued the cause for appellant. On the brief were Stern, Reiter & Day, of Portland.

*Lee A. Ellmaker,* of Portland, argued the cause and filed a brief for respondents.

Before LATOURETTE, Chief Justice, and WARNER, BRAND, TOOZE and PERRY, Justices.

PERRY, J.

Prior to the 23rd day of August, 1948, Charles Beahm was the owner of a dwelling house situated upon the north 10 feet of lot 8 and all of lot "B", block 300, Central East Portland, in the city of Portland, and of certain furniture located therein, and on the 23rd day of August, 1948, he entered into a contract whereby he sold the real property and furniture for a cash down payment with the balance to be paid in monthly payments of $75 per month to Daniel C. Gamble and Iris M. Gamble, husband and wife.

On July 21, 1950, the purchasers filed a complaint in the circuit court of the state of Oregon for Multnomah county to rescind this contract, the rescission being based on allegations of fraud practiced upon them through misrepresentations made by the owner.

The owner, Charles Beahm, on July 25, 1950, brought suit to foreclose the interests of the Gambles in and to the real and personal property.

By stipulation of the parties at the time of trial, it was agreed that both cases should be tried as one and that upon the trial the complaint of each party should be considered as an answer and counterclaim to the complaint of the other, and that each party should be considered as having entered a general denial as to all matters set forth in the other's complaint,

except as to such matters as were admitted by the pleadings.

The trial court granted a rescission of the contract and, accordingly, denied the strict foreclosure prayed for by the owner, Charles Beahm, and caused to be made an accounting to place the parties in status quo.

From the decision of the trial court Charles Beahm appeals.

For the purpose of convenience, Daniel C. Gamble and Iris M. Gamble will hereinafter be referred to as the plaintiffs, and Charles Beahm as the defendant.

The contentions of the defendant on this appeal are, first, that no misrepresentations were made by the defendant to the plaintiffs; second, that if misrepresentations were made, they were not actionable; third, that at the commencement of the suit the plaintiffs were in default and, therefore, could not maintain this action to rescind; and fourth, that the plaintiffs, after having knowledge of the fraud, affirmed the contract and cannot now complain.

A resume of the facts disclosed by the evidence reveals the following: the defendant was the owner of a two-story house, constructed with basement and attic, and of some furniture, situated on the above described real property, which he had offered for sale; and that the plaintiffs were desirous of procuring income property. Mrs. Gamble, one of the plaintiffs, had in July, and a short time before the contract was entered into that is in issue in this case, herself received a license as a real estate saleswoman and was employed by Sexton & Company, real estate brokers in the city of Portland, with whom the defendant had listed his property for sale. Sometime in the latter part of August, 1948, together with other real estate salesmen

of the Sexton firm, the plaintiff, Mrs. Gamble, inspected this property, and later she, with her husband, returned to look over the property again, at which time the plaintiffs and defendant discussed the property.

The plaintiffs' version of this discussion is that they advised the defendant that they were looking for a property with rentals that would pay for the purchase of the building and where they, as managers of the property, would have their rent free; that the defendant advised them that this property was just what they wanted; that there were two apartments on the second floor that would rent for $40 each, which would take care of the payments, and that they could occupy the first floor apartment; that there was also an apartment in the basement and two rooms in the attic, advising them, however, that the attic rooms could not be rented because there was no fire escape. The defendant's version of this conversation is as follows:

"A I didn't tell her anything. I said the house is to be sold as is.

"Q You didn't make any statements as to the attic?

"A None whatsoever.

"* * * * *

"A I told her right then, I says 'go through the building, it is for sale for $11,500 completely furnished. I paid over $4,000 for the furniture.' I said, 'If you like it it is yours.'"

An agent for the real estate company with whom the defendant listed the property testified relative to the use of the property, stating that the defendant at the time he received the property for listing said "that he had two apartments on the second floor and a two

room apartment in the basement." This statement is also denied by the defendant, who stated in effect that the information the salesman received was from the salesman's own inspection of the premises and not from any statements he had made.

At the time the sale was consummated, the plaintiff, Mrs. Gamble, did not act as an agent for the real estate company in closing the transaction between the defendant and the plaintiffs, but another real estate salesman for the company handled this transaction, and the plaintiffs conferred with him for his opinion relative to the advisability of purchasing the premises.

After the signing of the contract of purchase of the real property by the plaintiffs it was discovered that the city code of the city of Portland permitted the use of the premises only as a two family dwelling and not as a multiple family dwelling, the basement being below the grade allowable for family occupancy and the second floor being inadequate for more than one family occupancy.

There is a dispute in the evidence as to when the plaintiffs were informed that the premises could only be used as a two family dwelling and not a multiple family dwelling, it being the contention of the plaintiffs that they were not advised of this matter until approximately a month before this suit was commenced, while the defendant contends that, as shown by the evidence of the plaintiffs' witness, John G. Baird, an inspector for the city of Portland, the plaintiffs were informed of this condition about the 22nd day of October, 1948.

While the evidence is conflicting as to whether or not it was represented that there were two available rentals on the second floor, the plaintiffs' testi-

mony is corroborated by another witness who occupied one of the supposed apartments, and by the further fact that if the defendant's evidence is true, relative to the information contained in the listing of the real estate company as to the two available rentals on the second floor and a two room apartment in the basement, that the listing was obtained by inspection and not by the statement of the defendant, then it is apparent that the property had been so constructed as to give the impression to interested purchasers that there were, in fact, two separate rentals on the second floor of this dwelling and a rentable apartment in the basement.

■ There is ample evidence, and we, like the trial court, are prone to believe that the defendant represented the property to be a multiple family dwelling. Such a representation was not so much an opinion as to what income might be derived from the premises as it was that the premises as offered for sale were then suitable for a certain purpose, that is, a multiple dwelling. The evidence is clear that a single available rental unit other than the space occupied by the plaintiffs could not possibly provide sufficient income to make the payments upon the purchase of the property.

■ Expressions that certain property is suitable for a certain purpose, when in fact it is not, are misrepresentations of a present material fact and are actionable. *Schuler v. Humphrey,* 198 Or 458, 257 P2d 865; 27 CJ 102, Frauds § 252, 37 CJS 314, § c53.

"It is laid down in the cases that a misrepresentation must be material in order that the law may take notice of it as a fraud. If, however, a party to a bargain has made misrepresentations for the purpose of inducing action by the other, and the other party has acted, relying upon the misrepre-

sentations, it seems that the former should not be allowed to deny that misrepresentations which have effectively served a fraudulent purpose were material. 5 Williston, Contracts rev ed, 4159, § 1490.

■ It must be remembered that this is a suit for rescission and not an action in damages for deceit. We have said many times that in an action to rescind a contract on the ground of fraudulent conduct, it is not necessary to establish all of the elements of fraud. The rule as stated in *Sharkey v. Burlingame Co.*, 131 Or 185, 197, 282 P 546, 550, is as follows:

"Rescission is often granted in cases where an action for deceit could not be maintained. The right of rescission does not, as the right to recover damages in a common-law action for deceit, depend upon fraud, for if the transaction was the result of a false representation of a material fact it cannot stand against the injured party's right to rescind, however honestly made."

So, even though the representation as to the availability of additional apartments that could be lawfully rented was innocently made and without any unlawful intent, yet when the plaintiffs discovered the truth, that this was but a two family dwelling and could not be used for more than two families, they had a right to rescind. *Dahl et al. v. Crain et ux.*, 193 Or 207, 229, 237 P2d 939; 5 Williston, Contracts rev ed, 4189, § 1500.

The defendant contends that Mrs. Gamble conferred with another salesman thereby making an independent investigation and was not entitled to rely upon the representations of the defendant. The evidence in this case shows that the lawfulness of the rentals was not inquired into nor was any advice given.

■ The defendant also contends that no artifice was used to prevent a full investigation and, therefore, the

plaintiffs must use their means of knowledge and cannot complain of the misrepresentations made by the seller. The rule in this state concerning due diligence and ordinary care required of a purchaser to be exercised in his own behalf insofar as the matter of rescission is concerned is adopted from the case of *Shappirio v. Goldberg,* 192 US 232, 241, 48 L ed 419, 24 S Ct 259, and is stated as follows:

> " * * * When the means of knowledge are open and at hand or furnished to the purchaser or his agent and no effort is made to prevent the party from using them, and especially where the purchaser undertakes examination for himself, he will not be heard to say that he has been deceived to his injury by the misrepresentations of the vendor." *Fairbanks et al. v. Johnson et al.,* 117 Or 362, 368, 243 P 1114.

■ While we are of the opinion that the statement as made by the defendant was a statement of a material fact upon which the purchasers had a right to rely, nevertheless, in any event, the means of obtaining information as to the rights of a purchaser to lawfully let the apparently available space in the residence were not furnished by the defendant, nor were they open or at hand. To obtain this information would have required an investigation of the records of the city of Portland, a study and an interpretation of its building code, and a purchaser in such a situation is not required to investigate the records, but may rely upon the representations of the seller, especially where the seller was informed of the proposed use of the premises by the buyer. *Ballard v. Lyon,* 114 Minn. 264, 131 NW 320, 38 LRA NS 301; *Gross v. William Penn Fire Ins. Co.,* 51 D & C 296; 5 Williston, Contracts rev ed, 4169, § 1494; 66 CJ 615, 617, Vendor and Purchaser, § 165.

The defendant also contends that the plaintiffs cannot maintain this suit for the reason that they were in default for failure to pay the last half of the 1949-50 taxes and the July payment due at the time notice was given by the plaintiffs to the defendant of their intention to rescind the contract.

While it is true that one in default may not ordinarily enforce the terms of a contract against another or recover for the breach of a contract when in default themselves (*Title & Trust Co. v. Durkheimer Investment Co.*, 155 Or 427, 63 P2d 909, 64 P2d 834; *Stilwell v. McDonald et ux.*, 100 Or 673, 198 P 567), this rule does not apply where no rights are sought to be enforced by reason of the contract itself, but relief is sought by reason of a fraud which had been relied upon by the party and which had vitiated the contract from its very inception. The fraud itself, when established, prevented the defendant in this case from enforcing any part or portion of the contract and no performance of the contract could be required at any time of the plaintiffs by the defendant unless the fraud of the defendant was waived.

> "The rule invoked 'applies only to cases where a rescission is sought or claimed by one party to an executory contract on the ground of a breach of the contract by the other party. * * * We know of no case which holds that such rule applies to a case where the vendee in default on payments due on the contract seeks to avoid and rescind it for fraud of the vendor in procuring its execution, or for mistake inducing its execution.' Lombardi v. Sinanides, 71 Cal App 272, 235 P 455, 457."

Which statement is cited with approval in the case of *Downs et al. v. Smith et al.*, 169 Wash 203, 13 P2d 440, 442; and see also *Joseph Martinelli & Co., Inc. v. Simon Siegel Co.*, 176 Fed2d 98, 13 ALR2d 1243, and note.

The defendant's fourth contention, that of ratification and laches, is based upon the belief that the evidence in this case shows that the plaintiffs had knowledge of the status of the purchased property on October 22, 1948, shortly after the contract of purchase was entered into and, although fully apprized of this fact, they continued the payments until July, 1950, thus waiving their right to rescind. *Holmes v. Burlingame,* 138 Or 193, 6 P2d 44; *McCabe v. Kelleher,* 90 Or 45, 175 P 608; *Scott v. Walton,* 32 Or 460, 52 P 180.

■ John G. Baird, a building inspector for the city of Portland, referring to a memorandum, testified as follows:

"Q  I would like you to clarify this paragraph which is dated October 22, 1948.

"A  'Mr. and Mrs. D. P. Gamble, the new owners, purchased from Fred Sexton, Mrs. Parker's salesman.'

"Q  You were talking to Mrs. Parker at that time?

"A  Mrs. Gamble.

"Q  You were talking to Mrs. Gamble?

"A  Yes.

"Q  What date was that?

"A  October 22, 1948.

"Q  What else did you say to Mrs. Gamble at that time?

"A  'She is now living on the first floor and renting two apartments on the second and using two attic rooms for family sleeping rooms. Informed her of legal two family status.' Then Mrs. Gamble said she was going after Fred Sexton to see if she can get some adjustment, and in the meantime will come in to try for the war code. The washbowl comes under a special code that has since been abolished, that is, they don't allow anybody to take out washbowl permits any more.

"Q When was that abolished?

"A January, 1950, that is, the issuance of any further permits.

"Q At this time in October, 1948 that was still in effect, was it not?

"A It was still in effect. I told her the attic could not be used, and then she was going in to try to get it straightened out with Fred Sexton, who sold it.

"Q And that was when you talked to her, in October, 1948?

"A Yes.

"Q When you went out on July 10, 1950 what occasioned your calling at that time?

"A I have so many of them, I wanted to see if they had got it straightened out and all cleaned up. It is always an open file until it is completed and taken care of."

With reference to the conversation with the building inspector on October 22, 1948, Mrs. Gamble testified as follows:

"A I was washing my hair when the doorbell rang. I went to the door in that condition. I just stuck my head out the door to talk to him.

"Q And what do you recall that Mr. Baird said to you at that time?

"A The first thing he said was, 'Have you fixed that hot plumbing upstairs yet?' and I didn't know what the devil he was talking about; I was very confused. At the time I told him if there was any plumbing to be fixed I thought Mr. Beahm should fix it, because we put everything we had into it, and he stated a few things; I didn't understand exactly what he was talking about, and he didn't particularly care to keep me, due to the condition I was in. However, I told him that anything we needed to do to the place we would fix it up as soon

as we were able, and that was about all the conversation we had.

"Q When did you next see Mr. Baird?

"A In approximately July, 1950.

"Q Could you tell us the circumstances which made you go to see Mr. Baird, or what were the conditions that existed?

"A Well, we knew that he had been there and we knew something was wrong with the plumbing, we didn't know what, and we were getting on our feet a little bit, and we figured we could fix it up, so I went to the City Hall to the plumbing inspector and asked him what needed to be done, that I was ready to fix it, and he said, 'I don't recall the case. It has been quite some time. I will have to make a re-inspection of the place', which he did. He called me at my place of business where I was working at the time and he told me what was wrong. I was very upset about the deal; I didn't know which way to turn. He told me he would write a letter, and I told him I would appreciate it very much if he could give me something in writing. I called the real estate commissioner and told him what I was up against, that the city was condemning my place, and that I had purchased it as income property, and the real estate commissioner told me we definitely have a case of misrepresentation and they are very strict on that in the City of Portland, and he told me to go talk to the real estate broker that we bought the place from. I talked to Mr. Sexton; I said, 'I have bought a piece of property that I can't rent out. What am I going to do about it?' So Mr. Sexton got the listing card and he said, 'Mr. Beahm says there are two two-room apartments and an apartment in the basement, and we took his word for it.' I told Mr. Sexton I had better see an attorney, and he turned the listing card over to me to take to the attorney. It was just about that time that the picture was beginning to develop, that we knew the place was illegal. I thought there was something wrong with the plumbing."

The evidence of the building inspector, reading from a memorandum, indicated that he had fully informed the plaintiff. On the other hand, Mrs. Gamble was positive that he had not informed her of the true status of the residence. We have often said, the trial court has an opportunity to observe the demeanor of the witnesses, and is in a better position, ordinarily, to evaluate and weigh the testimony as it is given from the witness stand than are we, confined exclusively to the cold record. Under the circumstances, we are not inclined to disturb this finding of the trial court.

■ Rescission must be made promptly after the discovery of the fraud, but the duty to act does not arise until the fraud is known.

> "One cannot waive or acquiesce in a wrong while ignorant thereof, and the wrongdoer cannot make extreme vigilance a condition of rescission. The person wronged, upon being fully advised, must, however, decide and act with reasonable dispatch." 12 Am Jur 1027, Contracts, § 445.

The plaintiffs in this case promptly rescinded when they were apprized of the status of this dwelling.

We have carefully considered all of the defendant's claims of error, whether discussed herein or not, and are of the opinion that this case should be affirmed.