Argued April 30, affirmed July 22, 1976

WATSON et ux, *Appellants,*

*v.*

FANTUS et al, *Respondents.*

552 P2d 251

*Oscar R. Nealy,* Grants Pass, argued the cause for appellants. On the briefs were Donald H. Coulter, and Myrick, Coulter, Seagraves & Nealy, Grants Pass.

*Daniel F. Hughes,* Grants Pass, argued the cause for respondents. With him on the brief were Brown, Hughes, Bird & Lane, Grants Pass, for respondents Fantus, and Schultz, Salisbury & Cauble, Grants Pass, for respondents Mladejovsky.

Before O'Connell, Chief Justice*, and McAllister, Denecke**, and Howell, Justices.

HOWELL, J.

---

*Chief Justice when case was argued.
**Chief Justice when case was decided.

## HOWELL, J.

Plaintiffs filed this suit seeking rescission of a contract to purchase a mobile home trailer park in Josephine County. Plaintiffs alleged that they purchased the property as a result of several misrepresentations by defendants.[1] Defendants filed a countersuit seeking strict foreclosure. The trial court entered a decree denying rescission and refusing strict foreclosure as well. Plaintiffs appeal.

On May 30, 1974, plaintiffs signed an earnest money receipt to purchase the property for $150,000. The agreement was subject to certain contingencies, and plaintiffs' offer was rejected. Later, there were further negotiations, and plaintiffs entered into an amended earnest money agreement which eventually resulted in their taking possession of the mobile home park on the first of August, 1974. The contract of sale was finally executed on August 19, 1974.

Plaintiffs' suit for rescission was filed on February 13, 1975. Plaintiffs alleged that defendant had falsely represented that the leach lines and septic tank facilities were adequate and in good condition; that the defendant had a permit to expand the park by adding 22 additional spaces; that the gross income for 1973 had been approximately $33,000; and that the utility poles were in good condition.

At trial no evidence was introduced to support the allegation of a misrepresentation as to the condition of the utility poles and, therefore, we will discuss only the remaining three allegations.

■ The evidence indicates that prior to signing the earnest money receipt the defendants' realtor stated to plaintiff that defendants had a permit to build 22 addi-

---

[1]References to defendants will be to the defendants Fantus, who sold plaintiffs their interest in the property which they, in turn, were purchasing on contract from defendants Mladejovsky. The latter were only nominal parties defendant in the suit. References to the plaintiff will be to plaintiff Gary Watson.

tional trailer spaces. However, we agree with the finding of the trial court that plaintiff was advised before he signed the sales agreement on August 19 that no actual permit for additional spaces had been granted, and that plaintiff nevertheless determined to proceed with the purchase.

■   We also agree with the trial court that plaintiff is not in a position to complain about the condition of the sewer system. Immediately after he took possession of the property on August 1, plaintiff discovered that the sewer system was not operating adequately. The situation was discussed with the defendants and, on August 19, an agreement was signed which provided that defendants would contribute up to $750 for the necessary repairs. After having freely entered into this agreement, plaintiff is not in a position to assert the same defect as a basis for rescission.

Plaintiff, however, relies primarily on the representation that defendants' gross income from the property for 1973 was just over $33,000. This information was supplied to plaintiff in a prospectus which he received before he signed the earnest money agreement. In contrast, defendants' income tax return for 1973, which was introduced at trial, showed a gross income of only $23,000.

Between the time the plaintiff signed the earnest money receipt and the execution of the sales agreement, plaintiff requested and received additional information from defendants' realtor regarding defendants' income for 1973. On July 6, 1974, plaintiff received a letter showing rental charged for the various trailer spaces. On July 16, after a further request, plaintiff received from the realtor an additional breakdown of the income for 1973. This information was consistent with the original representation as to gross income. However, the letter of transmittal contained the following admonition:

"Enclosed find the breakdown on the individual sources of income as tendered by Mr. Fantus. Along

[ 608 ]

these same lines of thought may we suggest that you come up and inspect the books personally and to your satisfaction as Nielsen Realty will not assume responsibility for the accuracy of these figures."

Plaintiff made no effort to examine the records before signing the contract of sale.

Plaintiff apparently took possession of the account books when he assumed operation of the park in early August, 1974. In September, plaintiff received an insurance statement which indicated that defendants had reported gross receipts of $13,000 for 1973.[2] Plaintiff became concerned and, upon checking the 1973 accounts, he concluded that the gross income for 1973 appeared to have been substantially overstated. Plaintiff then discussed legal action with his attorney. Apparently, several discussions were held while plaintiff and his attorney attempted to determine whether plaintiff should seek to rescind or bring an action for damages. Plaintiff testified that his attorney had indicated that "time was of the essence but not of that much importance." For five months plaintiff remained in possession, spent approximately $1,700 on improvements, and continued to make the required payments for the months of October, November, December, January and February.

In February, according to the August 19 sales agreement, the plaintiff was also required to make another lump sum payment of $20,000. The money was to have come from the sale of some property in California. The property was still in escrow, and plaintiff requested and received an extension of time from the defendants. Plaintiff admitted that he knew at that time that he was going to file suit for a rescission. After the suit was filed on February 13, 1975, plaintiff continued in possession and contested the appointment of a receiver.

■ The law is well established that a vendee who has

---

[2] Apparently the insurance premium was based on gross income.

been induced to enter into a contract by misrepresentation may either affirm the contract and bring an action for damages, or he may elect to rescind. The remedies are inconsistent, and if the vendee desires to rescind he must do so promptly. *Miller et ux v. Barker et ux,* 233 Or 113, 377 P2d 343 (1962); *Brown et ux v. Hassenstab et ux,* 212 Or 246, 319 P2d 929 (1957); *Scott v. Walton,* 32 Or 460, 52 P 180 (1898).

4. The record clearly discloses that the plaintiff knew in September of 1974 about the misrepresentation as to the gross income for 1973. Nevertheless, he remained in possession for five months, continued to make improvements, and negotiated an extension of time for payment. Plaintiff himself testified that at least part of the reason for the delay was that he was waiting to see whether he made a profit during the intervening period of time. Under these circumstances, we do not believe that plaintiff acted with reasonable promptness, and we conclude that he is not entitled to a rescission of his contract. *See Brown et ux v. Hassenstab et ux, supra. See also Miller et ux v. Barker et ux, supra; Nimrod Park, Inc. v. Rose,* 265 Or 221, 508 P2d 183 (1973); *Engelking v. Field,* 268 Or 537, 522 P2d 493 (1974).[3]

Affirmed.

---

[3] Since defendants have raised no issue concerning the trial court's refusal to grant a decree of strict foreclosure as requested in their countersuit, we have not considered this issue on appeal.