Argued January 6, reversed and remanded April 19, 1977

EDWARDS et al, *Respondents/Cross-Appellants,*
*v.*
WILCOXEN et al, *Appellants/Cross-Respondents.*
(No. 75-72, SC 24381)

562 P2d 1207

Paul J. Jolma, Clatskanie, argued the cause and filed briefs for appellants/cross-respondents.

William F. Thomas, Portland, argued the cause and filed a brief for respondents/cross-appellants.

Before Denecke, Chief Justice, and Bryson, Linde, and Mengler, Justices.

BRYSON, J.

**BRYSON, J.**

Plaintiff purchasers brought this suit to rescind their contract with defendants for the purchase of the Sea Breeze Restaurant and associated real and personal property. They alleged defendant sellers fraudulently or otherwise misrepresented the gross receipts and net profits of the restaurant during the year preceding the sale. The trial court decree granted rescission of the contract and awarded plaintiffs damages. The defendants appeal, and we review de novo.

The Sea Breeze is located approximately three miles south of Seaside, Oregon, on Coast Highway 101 near its junction with the Sunset Highway. The sale was consummated by a contract between the parties dated April 11, 1973.

Plaintiffs' complaint alleged in part as follows:
"IV

"Before plaintiffs agreed to purchase said business, real property and mobile home, defendants made certain representations to plaintiffs with the intention and purpose that plaintiffs should rely thereon in purchasing the business, real property and mobile home as follows:

"(a) That said restaurant business known as the Sea Breeze Cafe which had been operated by defendants during calendar year 1972, had gross receipts of $75,306.67 and a resulting net profit of $37,661.47, per the attached Schedule C from tax return form 1040 which is attached hereto, marked 'Exhibit C', and is hereby incorporated into this complaint by reference.

"(b) That plaintiffs could expect gross receipts from their operating said business of at least $75,000 for the year following the contract purchase date of April 11, 1973.
"* * * * *.

"VII

"That at the time defendants made the foregoing representations to plaintiffs, defendants either knew that the representations were false or made them recklessly without knowledge of the truth or falsity thereof.
"* * * * *.

[ 93 ]

## "IX

"That upon discovery that the representations were false, plaintiffs notified defendants that plaintiffs were rescinding the contract and were tendering back the business to defendants and demanded the return of the monies expended by the plaintiffs. Defendants have refused to comply with plaintiffs' demands.

"* * * * *."

Defendants' answer alleged in part as follows:

## "II

"Answering Paragraph IV thereof, defendants admit that they gave the plaintiffs the document, a copy of which is marked Exhibit 'C' to the Complaint. Defendants allege that they told the plaintiffs that defendants believed that plaintiffs could expect gross receipts from their operation of said business of $75,000.00 for the first year following the purchase of the property if plaintiffs operated the business in the same manner that the defendants had operated the same.

"* * * * *.

## "IV

"Plaintiffs received the document referred to as Exhibit 'C' in their Complaint on or about March 5, 1973. When they received the same, they knew that it did not refer to the calendar year 1972 but to the twelve months' period ending February 28, 1973. They also knew, or should have known, that it did not contain a list of all the expenses and deductions for said period, and they knew, or should have known, that it did not purport to show net income. * * *

"* * * * *."

Defendants assign as error the trial court's decree granting rescission and contend that plaintiffs waived any right to rescind the contract because they

"(a) Delayed an unreasonable length of time before electing to rescind.

"(b) Advertised the property for sale.

"(c) Maintained possession and made payments without any objection.

"* * * * *."

The plaintiffs argue that "[t]he facts in the case simply do not support this thesis. * * * [A]s time passed, the plaintiffs had a growing awareness that the gross and net income had been misrepresented to them, but waiting through the summer of 1974 was not an unreasonable delay."

■   The law is well settled that a party contending that a fraudulent or innocent misrepresentation was made to induce the purchase of a business must give notice of rescission promptly after the discovery of the misrepresentation.

In *Ross v. Carlyle et ux,* 216 Or 576, 578, 339 P2d 1114 (1959), the court stated:

> "Ever since the pronouncement of Mr. Justice Robert Bean in *Scott v. Walton,* 32 Or 460, 464, 52 P 180 (1898) (sometimes called 'the standard precedent'), this court has consistently held: that upon the discovery of fraud, he who desires to rescind, must act promptly and return or offer to return what he has received under the contract. He cannot retain the fruits of the contract awaiting further developments to determine whether it will be more profitable for him to affirm or disaffirm it. Any delay on his part, and especially his remaining in possession of the property will evidence his intention to ratify and abide by the contract. *Cooper v. Hillsboro Garden Tracts,* 78 Or 74, 85, 152 P 488 (1915); *Grant v. Cartozian Bros., Inc.,* 120 Or 607, 611, 253 P 531 (1927); *Holmes v. Burlingame Co.,* 138 Or 193, 198, 6 P2d 44 (1931); *Schuler v. Humphrey,* 198 Or 458, 480, 275 [257] P2d 865 (1953); *Gamble v. Beahm,* 198 Or 537, 550, 257 P2d 882 (1953); *Keller v. Lonsdale,* 216 Or 339, 112 P2d 339."

We have continually adhered to this rule in numerous cases, the latest being *Watson v. Fantus,* 275 Or 605, 610, 552 P2d 251 (1976).

■   We have also said that the facts and circumstances in each case determine what constitutes prompt rescission. *Schuler v. Humphrey,* 198 Or 458, 480, 257 P2d 865 (1953).

The facts in this case disclose that the plaintiffs are

more experienced in accounting, finance, and business than the defendants. Plaintiff Jordan is a college graduate with a degree in finance and 20 years' work experience with credit unions and as a trust officer. Plaintiff Edwards had 20 years' work experience as a bookkeeper. Prior to purchasing the Sea Breeze, plaintiffs owned and operated a Dairy Queen franchise at Depoe Bay, Oregon. Plaintiff Edwards did all of the bookkeeping for that operation and testified that he is generally familiar with restaurant costs and operating expenses and the percentage of gross sales normally realized as net profit.

Prior to defendants' purchase of the Sea Breeze they operated a dairy farm as partners on the Oregon coast. Neither had formal education beyond high school and neither is familiar with the intricacies of accounting, bookkeeping or tax returns. While defendants operated the Sea Breeze, Wilcoxen kept daily gross receipts and expenditures which were turned over to a Mrs. Bradley, who prepared their tax returns. Mrs. Bradley had no formal education in accounting, but had done business with defendants when they operated the dairy farm, and she prepared defendants' tax returns as a favor and without charge.

Plaintiffs saw an advertisement offering the Sea Breeze for sale and prior to entering into the contract, they visited the restaurant during business hours and liked what they saw. Before signing the contract, plaintiffs requested a statement showing defendants' gross sales and income for the preceding 12 months. Mrs. Bradley prepared this information on a "Schedule C" form for U. S. income tax returns. This form was given to the plaintiffs on March 5, 1973. There is a dispute in the testimony as to whether the figures on the "Schedule C" form covered the calendar year 1972 or the 12-month period ending February 28, 1973.

This "Schedule C" form incorrectly lists defendants' gross receipts as $75,306.67 and net profits as $37,661.47. The evidence shows that defendants' gross

receipts for 1972 were $68,701.65 and for the 12-month period ending February 28, 1973, were $73,252.23. Net profits were $14,270 or $16,389.23, depending upon whether the gross profits for the calendar year 1972 or the period ending February 28, 1973, were used.

Defendant Wilcoxen testified that the discrepancy between the gross receipts listed on the Schedule C provided plaintiffs and the partnership's actual gross receipts was due to his accidental inclusion of an extra one-half month's receipts. The overstatement of the figures identified as "net profits" was due to at least two factors. First, the gross receipts and expenses were mismatched in that the expenses deducted from the gross receipts generated between March 1, 1972, and February 28, 1973, were those used by defendants on their 1972 partnership tax return. Secondly, the bulk of the discrepancy is due to defendants' failure to deduct all of the items of expense necessarily and usually deducted to arrive at a net profit. The Schedule C statement given by defendants to plaintiffs shows on its face that it covered only costs of goods sold, taxes on business and business property, wages, utilities, laundry and miscellaneous supplies. It shows no deduction for depreciation, repairs, advertising, automotive expenses, supplies, postage, freight, telephone, sanitation services, or professional expenses.

The evidence shows that plaintiff Edwards handled most of the business transactions and made most of the decisions for the plaintiff partnership. Edwards testified that he was aware that defendants' profit and loss statement Schedule C showed no deductions for sanitary service, automobile expenses, depreciation, postage, freight or insurance, and that he realized that a restaurant such as the Sea Breeze would incur those types of expenses. Edwards further stated that he did not necessarily believe that defendants made as much as they had represented and that from his knowledge

and experience he expected profits from the restaurant to be between 20 percent and 25 percent of the gross receipts, or between $18,000 and $20,000 on volume of $74,000 gross receipts. Plaintiff Edwards testified:

"A  My primary concern was the gross figures.

"* * * * *.

"A  I knew exactly what I expected to receive from the $74,000 gross.

"* * * * *.

"A  I expected we would receive between $18,000 and $20,000.

"Q  * * * If you bought a business that grossed $75,000 and netted $18,000 to $20,000, would you be satisfied?

"A  I was prepared to be satisfied, yes, that is why I bought it.

"Q  Then, you didn't really believe they netted $35,000 then?

"A  Not necessarily."

Edwards also testified that if the restaurant grossed $75,000, "I would have felt that it was worth the price."

The following is the evidence pertaining to the question of whether or not the plaintiffs promptly sought rescission after knowledge of what they determined to be misrepresentations in the Schedule C form. It should be noted that shortly after plaintiffs purchased the Sea Breeze they materially changed the restaurant operation. Defendants had no dress requirements for customers other than those maintained by health and safety codes. The atmosphere was informal. Defendants kept the Sea Breeze open for business from 11:30 a.m. until 8:00 p.m. and were closed only on Mondays. During operation of the restaurant by defendants, they took advantage of the restaurant location on the main highway connecting Portland and the coast, and they catered to vacation and travel trade. Defendants offered a large selection of sandwiches, hamburgers, shrimp baskets, fried chicken baskets, and offered dinners of the type

purchased by vacationing or traveling people. They also developed a sizeable luncheon trade among local business and tradespeople. During the winter months the restaurant was frequented by fishermen, elk hunters and deer hunters.

Plaintiffs changed the restaurant operation. Plaintiffs shortened hours and days of operation. They were interested in operating something more than a hamburger and sandwich restaurant and they sought to generally upgrade the Sea Breeze trade. Hamburgers and most sandwiches were eliminated from the menu. Plaintiffs established a dress code forbidding shorts, swim suits and tank and halter tops. They posted signs refusing service to persons smoking pipes or cigars. The price of coffee was increased to 50 cents per cup and the price of dinners was increased on an average of 35 cents to $1.00 to reduce transient business; reservations were required for dinner.

Plaintiff Edwards admitted that the plaintiff partnership tried to establish a restaurant with a different class of customers than those catered to by defendants and they sought to operate the restaurant on a different economic basis than defendants operated.

Plaintiffs' attempt to transform and upgrade the Sea Breeze was not successful. Average daily gross sales dropped to $206 during the first six and one-half months of 1975, during plaintiffs' operation, from $285 daily during defendants' last three and one-half months of operation (January, 1973, through April, 1973). Plaintiffs reported financial losses each year they operated the restaurant.[1]

---

[1]The full extent of these purported losses is difficult to determine. Plaintiffs divided the ownership of the real property and the restaurant business, retaining ownership of the fee in their own names and placing the restaurant business in the name of Granny Grump, Inc., a corporation wholly owned by plaintiffs. Plaintiffs charge $875 per month rent to the corporation for the restaurant building. Plaintiffs also testified that they lived rent free in the mobile home included with their purchase of the Sea Breeze, and that they charged all of their meals and automotive expenses to the restaurant. Evidence was also introduced that some of the charges to petty cash were for personal and nonbusiness expenses.

Plaintiff Edwards also testified that he discovered defendants' representations in Schedule C, the profit and loss statement, were incorrect only within the last two months or so before trial, when plaintiffs had access to defendants' books. This is difficult to believe.

On direct examination, Edwards testified:

"Q   Has the business been profitable —

"*  *  *  *  *.

"A   During 1973?

"*  *  *  *  *.

"A   We had a loss in 1973.

"Q   During the calendar year 1974?

"A   We had an additional loss.

"Q   We are now in the sixth month of 1975, what is the situation?

"A   An additional loss.

"*  *  *  *  *.

"Q   So, in round figures, the gross receipts from the Sea Breeze [for 1973] would be about $38,000?

"A   Yes, right.

"*  *  *  *  *.

"A   The net for 1973, our net loss was $5,213.

"*  *  *  *  *.

"A   For 1974, the receipts [gross] were $54,979; and the loss was $2,227.

"*  *  *  *  *.

"A   The gross through June 30, 1975 is $27,951.15."

On cross-examination, plaintiff Edwards testified:

"Q   When did you first begin to think that the sellers had deceived you?

"A   As a matter of fact, the very first summer.

"*  *  *  *  *.

"Q   Was your opinion strengthened, then, in August, 1973?

"A   My opinion began to strengthen quite constantly.

"*  *  *  *  *.

"Q   Would it be correct to say, as every month rolled

by, your opinion got stronger and stronger, that you had been deceived?

"A   Right.

"* * * * *.

"Q   What about in May, June, and July, 1974?

"A   Then I knew we had been [deceived]."

In other words, 15 months after the sale plaintiffs felt certain that they had been deceived. Prior to this, they must have had a strong suspicion. On October 10, 1974, plaintiffs wrote the defendants, advising as follows:

"For the past months, almost from the time we purchased and took over operation of The Sea Breeze, there has been a very strong suspicion in our minds that the figures as given to us concerning your gross sales income, as well as the net income, during 265 days of your operation in 1972, were misrepresented and completely false.

"* * * * *.

"If you are amenable to sitting down and discussing this matter in a business-like and reasonable manner, we should like to have such a meeting in the very near future. Hopefully, we can come to some more equitable agreement that will benefit both of us, or rather all of us, without a lot of unnecessary legal fees and lost time."

Plaintiffs filed the instant suit on December 23, 1974.

From our review of the evidence, it is apparent that plaintiffs knew that they were not producing the $75,000 gross sales, as represented by the defendants. There is also evidence that they did not necessarily believe the "net profit" figure presented to them on the profit and loss statement. They knew that they had materially changed the operation of the restaurant and the type of business they were conducting and they delayed any action as to rescission until October 10, 1974, some 18 months after the sale and some 12 months after they realized they were not producing gross sales in the amounts represented by the defendants. Plaintiffs, having discovered that they were not doing the gross business represented by the defend-

ants with their new type of restaurant operation, should not be allowed to speculate risk-free on the success of the business, as they operated it, knowing that they might later rescind should their profits fall short of their expectations. The evidence further shows that plaintiffs advertised the restaurant for sale in the Los Angeles Times some 18 days before their October 10 letter to the defendants. The asking price was $75,000, $9,000 more than the price they paid defendants; also, plaintiffs entered into a five-year lease-purchase agreement for a new sign on the outside of the restaurant 30 days prior to the October 10 letter.

We do not view the facts in this case to demonstrate intentional fraud. If this were true, we would be less sympathetic to defendants' defense of waiver. Also, the defendants did not know that the plaintiffs contemplated making extensive changes in the type of restaurant plaintiffs intended to operate on the premises. Plaintiffs, having failed in their attempt to upgrade the restaurant, delayed electing to rescind the contract, and the defendants, under the facts of this case, should not be the victims of the plaintiffs' failure. We conclude that plaintiffs, by their actions, waived their right to sue for rescission.

Having concluded that plaintiffs were not entitled to rescission, we need not discuss plaintiffs' further assignments of error and the defendants' cross assignment of error, both pertaining to damages.

Reversed and remanded for entry of a decree in accordance herewith.