Argued and submitted February 27, reversed and
remanded August 4, reconsideration denied September 11,
petition for review denied November 20, 1980 (290 Or 157)

# SNYDER,
*Respondent,*

*v.*

# RHOADS,
*Appellant.*

## (No. 37-545, CA 14568)

615 P2d 1058

Henry Kane, Beaverton, argued the cause and filed the briefs for appellant.

Thomas J. Moore, Hillsboro, argued the cause for respondent. With him on the brief was Brink, Moore, Brink & Peterson, Hillsboro.

Before Schwab, Chief Judge, and Thornton and Campbell, Judges.

THORNTON, J.

**THORNTON, J.**

This case arises out of the purchase by defendant of plaintiff's two dry cleaning stores. Defendant signed two promissory notes for the purchase price. The jury returned a verdict for plaintiff on the unpaid balance of these notes following repossession and resale of the stores after defendant shut down both stores.

Defendant's assignments of error present three issues on appeal: Did the trial court err

1) in striking defendant's counterclaims (one alleging affirmance of the contract and the second alleging rescission) and seeking damages for fraud in inducing defendant to buy the stores?

2) in refusing to admit into evidence the multiple listing contract which plaintiff signed with Mayfair Realty?

3) in refusing to admit plaintiff's 1974 tax return with respect to profits and losses of the operations?

The following is a summary of the essential facts:

On February 18, 1975, plaintiff signed a multiple listing agreement with Mayfair Realty for the sale of two dry cleaning establishments in Hillsboro. During the spring of that year defendant, who already owned and operated a similar business, became interested in purchasing the two stores. He met with plaintiff a couple of times and also with a Mr. Huffman, a salesman with the firm of Property Sales, Inc. At trial, defendant testified that Mr. Huffman had shown him a photocopy of the original listing agreement which contained figures representing annual operating expenses and income for an unspecified time period. The bottom line showed a "net operating income" of $21,938.10.

Defendant did not purchase the stores immediately. Following further investigation, some of the details of which are set forth below, he determined that he could not raise the money for the downpayment and did not pursue the matter further. The stores were then sold to a third party. Later in 1975, defendant was contacted by Mr. Huffman and told that the third party to whom the stores were sold was willing to lend defendant funds to meet the downpayment. Defendant agreed to purchase the stores in September, 1975.

In October, 1975, defendant discovered that plaintiff had suffered a net operating loss in 1974 of $6,876 while operating the stores. Defendant testified that plaintiff had not informed him of this fact despite his attempts to inquire into the financial status of the businesses and had, to the contrary, led him to believe that the businesses had been profitable in recent years. Defendant continued to operate the stores, however, and made payments to plaintiff (some of which were late) until February, 1977. In May, 1977, defendant shut down both stores, asserting a lack of sufficient capital to continue operations.

Plaintiff, pursuant to a security agreement, took possession of the two stores and attempted to resell them. He testified that they were in very rundown condition and that much of the machinery was broken down. He eventually sold one store at private sale for $10,000 and purchased the other himself for $25,000. Then he brought suit to collect the balance due on the two notes. The case went to trial on the fourth amended answer and affirmative defense which alleged fraud. The jury found for plaintiff after the case was submitted to it under former ORS 18.140(2).[1] It also found in answer to a special inter-

---

[1] "In any case where, in the opinion of the court, a motion for a directed verdict ought to be granted, it may nevertheless, at the request of the adverse party, submit the case to the jury with leave to the moving party to move for judgment in his favor if the verdict is otherwise than as would have been directed." Former ORS 18.140(2).

rogatory that plaintiff had not committed a fraud upon defendant.

We address first defendant's assignment of error with respect to exclusion from evidence of the listing agreement.

Defendant first offered a photocopy of the purported listing agreement (Exhibit 11). He stated he had not received a copy of the document (which he testified was this listing agreement) shown to him by Huffman in the spring of 1975 and that he had checked both with Property Sales and Mayfair in his attempt to obtain a copy but was unsuccessful. The photocopy offered as Exhibit 11 had been obtained from another realtor who was not involved in the present transaction.

Plaintiff examined Exhibit 11 and acknowledged that the signature on it was his although the document did not appear the same as when he signed it. He further stated he did not receive a copy of this form. Plaintiff produced the sales file of Property Sales, Inc. The copy of the listing agreement which was allegedly shown to defendant by Huffman was not in it. However, Huffman was no longer with Property Sales and was not called as a witness at trial.

Plaintiff objected to admission of this document on several grounds, most notably: (a) Exhibit 11 was not the document shown to defendant and defendant had not established proper diligence in attempting to locate the original, contrary to ORS 41.640(1)(b), and (b) the listing agreement was hearsay and was not admissible under any exception. As to the remaining grounds for exclusion claimed by plaintiff, which we need not detail here, the trial court correctly observed that they went to the weight of the evidence, not to admissibility. Nevertheless, he excluded Exhibit 11 primarily on the ground that the ancillary arguments which would arise with respect to what defendant had been shown and the absence of Huffman to corroborate

defendant's testimony created a stronger need for the original.

Later at trial, defendant called Mr. Spanbauer, a representative of Mayfair Realty, who identified Exhibit 37 as the original listing agreement signed by plaintiff which real estate brokers are required by law to keep in their original transaction file. Exhibit 37 is the original from which Exhibit 11 was made and is identical to Exhibit 11. The listing form signed by plaintiff is a four-part form. One copy goes into the original transaction file, two copies go to the Multiple Listing Service (MLS) and the fourth copy goes to the client. From the information submitted MLS prepares its own form which is then incorporated into the multiple listing catalog and distributed among subscribing realtors. Spanbauer could not state what information was taken from the signed agreement for inclusion in the catalog. The multiple listing catalog containing the information for plaintiff's two businesses was not introduced at trial.

Plaintiff objected to the admission of Exhibit 37 on the sole ground that defendant would not have seen the signed agreement but the information in the multiple listing catalog and, because it was impossible to tell what information was drawn from Exhibit 37 and put in the catalog, the exhibit should be excluded. A discussion was held off the record and the trial court sustained plaintiff's objection without elaboration. The parties did stipulate that plaintiff had signed a multiple listing agreement.

On appeal, defendant assigns as error only the exclusion of Exhibit 37. Plaintiff contends on appeal that Exhibit 37 was inadmissible for the same reasons raised at trial with respect to Exhibit 11. We have reviewed these grounds, as well as the ground asserted, because we must sustain the exclusion of evidence by a trial court if it was excludable on any ground, even though the ground relied on may be erroneous. *N. Portland Lumber Co. v. G. L. Pine Co.,* 265 Or 617, 619,

510 P2d 565 (1973). As mentioned earlier, most of the reasons given by plaintiff for exclusion of the listing agreement go to the weight of the evidence, not admissibility.

We conclude that Exhibit 37 was admissible and its exclusion from evidence was reversible error. Defendant testified that he saw a copy of the listing agreement, not the form prepared by MLS. While there is evidence to suggest that defendant did not in fact see a copy, such evidence, again, relates to credibility, not admissibility.

■ Plaintiff argues Exhibit 37 is excludable as hearsay. On appeal, the parties' arguments relate to whether it was admissible under the business records exception. ORS 41.690. We need not decide the matter, however, because, although Exhibit 37 contains out-of-court statements, it is not being offered to establish the truth of the operating capital figures shown thereon. Defendant had the burden of showing that representations were made upon which he had the right to rely. Exhibit 37 contains such representations. Whether they were true or false is an independent question. A statement which is hearsay for one purpose is nevertheless admissible if relevant for a non-hearsay purpose. *See Marr v. Putnam,* 213 Or 17, 321 P2d 1061 (1958) (libel action in which plaintiff's testimony that friends greeted him "Hi, racketeer" was admissible to show that an article about plaintiff was interpreted as making that accusation against plaintiff).

Finally, we believe defendant has met his burden under ORS 41.640 to show that the actual photocopy he was shown could not be produced at trial. That statute permits introduction of secondary evidence "when the original cannot be produced by the party by whom the evidence is offered, in a reasonable time, with proper diligence, and its absence is not owing to his neglect or default." ORS 41.640(1)(b).

It is curious to note that the situation here is the converse of that normally encountered in best evidence situations. Here, the document defendant claims he saw and relied on is a photocopy of Exhibit 37. It is this document that is the "original" for purposes of the statute. Exhibit 37, the agreement signed by plaintiff, is being offered as secondary evidence of what defendant claims he saw.

The photocopy of the listing agreement purportedly shown defendant by Huffman was not in Property Sales, Inc.'s file. Defendant testified that he checked with both Mayfair and Property Sales in an attempt to find the listing agreement and finally got a copy from a third realtor (Exhibit 11). Subsequently Mayfair apparently located its master copy (Exhibit 37) which was offered. Failure to locate "the original" where it should have been—in the file of Property Sales—was not defendant's fault. Further, the fact that introduction of Exhibit 37 might give rise to disputes as to why "the original" could not be produced (the trial court's stated reason for excluding Exhibit 11) is not a basis for rejecting a copy.

Having concluded that it was error to exclude the listing agreement, it follows that the judgment for plaintiff must be reversed and a new trial ordered.

The substance of defendant's fraud allegations was that plaintiff had shown him figures for 1975 operations which showed a profit, but had withheld from defendant, by means of nondisclosure and evasion of defendant's requests for financial records, information demonstrating that plaintiff had suffered a sizeable loss in 1974. The figures on Exhibit 37 purport to reflect the annual operating income and expenses of the two establishments, most probably for 1974 since the agreement was signed in February, 1975. If these figures are incorrect, it would tend to support defendant's fraud claim. While the jury might have found defendant's proof of fraud deficient in a number of respects, we cannot say its verdict would

not have been different had it had before it evidence tending to prove that plaintiff affirmatively misrepresented the profitability of his business.

■ We proceed to defendant's remaining assignments of error beginning with the exclusion of plaintiff's 1974 income tax statement. At trial, the dispute centered largely around the relevancy of the document in light of defendant's testimony that he asked for financial records for 1974 (which he understood to include tax statements) but that he had not specifically requested to see tax information. Regardless of the relative merits of the parties' contentions, the tax statement will be admissible on remand. As part of his burden of proof, defendant will have to show that the figures contained in Exhibit 37 are false. *Williams v. Collins,* 42 Or App 481, 600 P2d 1235, *rev den* 288 Or 173 (1979). The tax profit and loss statement is relevant on this point.

Defendant's remaining assignments of error relate to the granting of plaintiff's motions for partial summary judgment on defendant's counterclaims for fraud, the first based on affirmance of the contract and the second based on rescission of the contract. Defendant claims that he first determined he had been defrauded in October, 1975, shortly after he took over operation of the businesses. He nevertheless continued to make payments under the contract and operate the stores until early 1977. In May, 1977, when he shut the stores down because they were losing money, defendant tendered the keys to the premises to plaintiff, which offer was rejected.

■ Defendant has at all times maintained, despite pleading the second counterclaim for rescission, that he chose to affirm the contract. Plaintiff asserts that the tender of the keys constitutes an abandonment and manifests an intent to rescind the contract. The attempted rescission, plaintiff further contends, is ineffective because defendant's continued performance for nearly 18 months after discovery of the fraud

[553]

amounts to a waiver of defendant's power to rescind the contract. Defendant counters that closing the stores was an attempt to mitigate his damages.[2]

■ It has long been established that a party induced by misrepresentation to enter into a contract has an election of remedies; he may rescind the contract and be entitled to return of any consideration he has parted with or he may affirm the contract and sue for damages. *Chester v. McDaniel,* 264 Or 303, 305-06, 504 P2d 726 (1973). An election to affirm constitutes a waiver of the power to rescind. The power to rescind may also be waived by any unreasonable delay in exercising the power. *Brown et ux v. Hassenstab et ux,* 212 Or 246, 254-55, 319 P2d 929 (1957). *See also* Restatement of Contracts, § 483 (1932).

■ We believe defendant waived his power of rescission in this case. He retained the property and attempted to operate it for a year and a half after discovering the alleged fraud and continued his own performance. He testified that, despite the alleged misrepresentations, he thought the businesses might generate a profit. Finally, he has insisted that he intended to ratify the contract. Therefore, the motion for summary judgment on the second counterclaim pleading rescission was properly granted. *Watson v. Fantus,* 275 Or 605, 610, 552 P2d 251 (1976) (delay of five months after discovery of fraud during which time

---

[2] We do not believe that defendant's tender of the keys to the stores constitutes an abandonment as a matter of law. Plaintiffs cite *Bridgmon v. Walker,* 218 Or 130, 344 P2d 233 (1959), for this proposition. In *Bridgmon,* the plaintiff-buyers occupied a house for several years after discovery of the fraud and then moved out. The court held this was an attempt to rescind the contract. In this case, however, such a conclusion cannot be drawn as a matter of law. Plaintiffs retained a security interest in the stores which entitled them to foreclose against the property in the event of default. Tender of the keys may have been an acknowledgment on defendant's part that he was in default and could not continue making payments. Defendant could consistently acknowledge default, admit owing money under the contract and still maintain he had been defrauded in the initial sale. Further, the property here is business property (not a residence as in *Bridgmon*). Defendant's claim that he shut down the stores to minimize losses is plausible and is not inconsistent with his claim that he ratified the contract.

[554]

plaintiff remained in possession of property, made improvements and negotiated extension of time for payment precluded rescission).

The question remains whether defendant is similarly precluded from alleging affirmance of the contract and suing for damages. Plaintiff argues, and the trial court apparently held, that defendant may not maintain an action for damages because he was in default on the payments due at the time the counterclaim was filed. Plaintiff relies on *Rayburn v. Norton,* 117 Or 328, 243 P 560 (1926), in which the court characterized plaintiff's suit as one for rescission rather than as an action for damages, stating that plaintiff could not sue for damages because he had failed to pay $400 due simultaneously with the transfer of title to the land which was the subject of the contract.

> "* * * This is upon the principle that no party to a contract can recover upon the same when he is himself in default as to performance, unless performance upon his part has been waived by the opposite party. * * *" 117 Or at 335.

In *Gamble v. Beahm,* 198 Or 537, 546, 257 P2d 882 (1953), however, the court set forth an arguably contrary rule:

> "While it is true that one in default may not ordinarily enforce the terms of a contract against another or recover for the breach of a contract when in default themselves [citations omitted], this rule does not apply where no rights are sought to be enforced by reason of the contract itself, but relief is sought by reason of a fraud which had been relied upon by the party and which had vitiated the contract from its very inception. * * *"[3]

We believe *Gamble* more accurately states the rule in this jurisdiction and is in line with the weight

---

[3] Plaintiffs contend that this language refers only to rescission and cite other language in *Gamble* (198 Or at 544). The language cited, however, refers only to the difference in proof required for fraud actions for damages as opposed to actions seeking rescission.

of authority. It is footnoted at 37 Am Jur 2d, Fraud and Deceit, § 390 (1968), as authority for the following:

"Thus, full performance of the contract of purchase by a purchaser is not a condition precedent to his right to maintain an action for damages for fraud even though he has not performed fully all his obligations under the contract. * * *

"In many cases where the contract is only partially executed, it would be unjust to hold, because of the theory on which an action for deceit is said to be based, that the party defrauded shall lose the advantage which attaches to a tort action, unless he makes further venture in the transaction into which he has been induced by fraud to enter."

In this case, one of the alleged misrepresentations was that defendant would be able to make payments on the contract out of the profits of the businesses. If in fact the stores could not generate profits in this amount and were losing money, it would be anomalous to require defendant, as a condition precedent to bringing an action for damages, to continue investing his own independent funds in the businesses. Defendant is entitled to bring his counterclaim affirming the contract and seeking full damages for fraud.

Reversed and remanded.