Argued March 8, affirmed as modified May 10, 1977

## BODENHAMER et ux,
### *Respondents/Cross-Appellants,*
### *v.*
## PATTERSON et al,
### *Appellants/Cross-Respondents.*
### (No. 74-931, SC 24464)

563 P2d 1212

Randolph Lee Garrison, Roseburg, argued the cause for respondents/cross-appellants. With him on the brief was Thomas Garrison, Roseburg.

Dean Heiling, Roseburg, argued the cause and filed briefs for appellants/cross-respondents.

Before Denecke, Chief Justice, and Holman, Lent and Davis, Justices.

LENT, J.

**LENT, J.**

Bodenhamers, the vendors, brought this suit to foreclose a land sale contract. Pattersons, the purchasers, counterclaimed for rescission and prayed for the return of their down payment and closing costs and for reimbursement for expenses incurred in attempting to construct a road. The trial court granted the rescission, but denied recovery for the road construction expenses. Pattersons appealed from this denial of financial relief, and Bodenhamers cross-appealed from the decree of rescission and denial of foreclosure. We review de novo. ORS 19.125(3).

The property in question is located near Sutherlin in Douglas County. In 1970, Mr. Harrington, the former owner, hired a Mr. Cullett to drill a well on the property. Mr. Cullett drilled, but found no water. He reported to Mr. Harrington, and to the State Engineer, that the well was dry.

In 1971, after Bodenhamers had acquired an interest in the property, it was sold on contract to a Mr. Sims. After building a house on the property, Mr. Sims testified, he discovered that the well was dry. He notified both Mr. Harrington and the Bodenhamers of this fact and later brought suit against them. That suit was settled before trial. Pursuant to the settlement agreement, Sims removed the house from the land, and his contract interest was extinguished.

In May of 1973, Bodenhamers listed the property for sale with a real estate agent who negotiated a sale to Pattersons in November of 1973. Pattersons planned to place a mobile home on the property and live there. They applied for the necessary permits, moved onto the property in a camper or trailer, and did some construction work on a road to provide access to their intended homesite. After some of the work was done, but before the road was completed, they learned the well was dry. They then left the property and made no payments on the contract. This suit followed.

Pattersons contended that the contract was induced by fraudulent misrepresentations, made by Bodenhamers through their real estate agent, that the well was a working well when in fact it was dry. The trial court agreed that the condition of the well had been misrepresented, but found it unnecessary to decide whether the misrepresentation was innocent or intentional, relying on the well-recognized rule that even an innocent misrepresentation of a material fact is grounds for rescission.

■ The contract of sale contained the following provision:

> "*REPRESENTATIONS:* Buyer agrees and warrants, as a part of the consideration for this sale to it, that it has inspected all said property on its own behalf and that in making this purchase and in executing this contract, it is not relying upon any representations, warranties, guarantees or covenants of Seller or any party acting for Seller with respect to the condition of said property, and Buyer explicitly waives any claim on that account. The parties hereto agree neither Seller nor any party acting for Seller has made any such representations, warranties, guarantees or covenants . . . ."

In our recent decision in *Wilkinson v. Carpenter,* 276 Or 311, 554 P2d 512 (1976) we held that a contractual provision that there have been no representations other than those contained in the contract itself is a bar to rescission on the grounds of innocent misrepresentation. Such a contract, we held, can only be rescinded if the misrepresentation which induced the contract was fraudulent. *Wilkinson,* which was decided after the trial court's decree in the present case, requires that we determine whether, if there was a material misrepresentation in this case, it was fraudulent.

Mr. Bodenhamer testified that when he listed the property for sale he told Mr. McKnight, the salesman who handled the listing:

> "* * * we were sued about the well and so I know nothing about the well and if you go to sell it it's nothing

but a hole in the ground. As far as I'm concerned it is not even a well and be sure and tell them that I do not guarantee no well, and that's the way it stood."

Mr. McKnight's version of this conversation is somewhat different:

"The only thing they * * * told me at the time of the listing was that they didn't know anything about the well and they couldn't guarantee it because as far as they knew the fellow who drilled the well had just pulled his equipment and had left and had never cleaned the well out, and they stated about what I told Mrs. Bodenhamer [sic] that maybe the well could be cleaned and might—might have water and it might not but they didn't want to guarantee it."

He denied that Mr. Bodenhamer ever told him that the Sims litigation involved the condition of the well, or that the well was "nothing but a hole in the ground."

When Mr. McKnight showed the property to the Pattersons, the well was discussed. His testimony and that of Mrs. Patterson[1] are in agreement that he said the well might have to be cleaned, and that he didn't know much about it but would find out. Mr. McKnight testified that he then telephoned the State Engineer and was told that the only recorded well in that section was dry.[2] His testimony continued:

"I told that to the Pattersons and I told them also I wasn't sure that that was the well because there are other wells in that area there and so there was no way for me to know what—what the well would do and that we couldn't guarantee the well."

"* * * * *

"I told her that there was only one well recorded, I wasn't sure if this was the well, but the one that was recorded was dry and it was a good chance that this one would be dry."

"* * * * *

---

[1]Mr. Patterson was ill at the time of trial and did not testify.

[2]Mr. Cullett's report to the State Engineer contained an incorrect section number. It is likely, therefore, that the information received by Mr. McKnight from the State Engineer had nothing to do with this well.

"I suggested that they speak with the neighbor who was across the road so that they can know for themselves what the well situation in the area was."

"* * * * *

"I told them that the owners had stated that maybe the well had never been cleaned and that cleaning the well that they might—they might get water and they might not. That would be something they would have to decide but that we would not be able to guarantee the well."

Mrs. Patterson, however, testified that after Mr. McKnight said he would find out about the well,

"* * * later on he told me it was the best well in the area or something to that effect. I can't be specific on the exact words."

Mr. McKnight denied having made this statement.

Both the earnest money agreement and the final contract of sale contained statements that the "well on the property" was "not guaranteed" by the seller. Mrs. Patterson testified that she inquired about this provision, and was "told that this just meant that the well had not been timed." Her testimony was vague as to who had made this statement and when it was made. Both Mr. McKnight and Mr. Orton, another salesman who had dealt with the Pattersons during the transaction, denied making it.

The trial court made no special findings with respect to any of these controverted matters. We are not convinced by Mrs. Patterson's testimony that Mr. McKnight told her the well was the best in the area. Her testimony about the surrounding circumstances was so vague that we give little weight to her recollection of what was said about the well. Nothing else in the evidence suggests that such a statement was ever made.

It is clear, however, that whatever the Pattersons were told about the well they were never told that the well was, as Bodenhamers knew, dry. Mr. McKnight never told the Pattersons that fact because, according

to his testimony, the Bodenhamers never told him. Mr. Bodenhamer's testimony is to the contrary, but we find that of Mr. McKnight more convincing. We are persuaded that Bodenhamers, although they told Mr. McKnight they were unwilling to guarantee the well, never told him that a previous purchaser had found the well to be dry.

Having found these to be the facts, we must determine whether they constitute a material misrepresentation by which Pattersons were fraudulently induced to agree to purchase the property.

██ A statement that one has no knowledge of a certain fact when one does possess that knowledge is a misrepresentation of fact which may be material. *Kubeck v. Consolidated Underwriters,* 267 Or 548, 553, 517 P2d 1039 (1974). A principal who deliberately withholds material facts from his agent in order that the agent may innocently misrepresent the facts is guilty of fraud if the agent does in fact make such a misrepresentation and it is relied on by the third party. *Restatement, Agency,* 2d 555 § 256; Tiffany, *Agency* 114 (2d Ed 1924); 2 Mechem, *Agency* 1561-62 (2d Ed 1914). In the present case the Bodenhamers knew that Mr. Sims, after building a house on the property, had discovered the well was dry. However, they did not tell Mr. McKnight of this fact. As a consequence, when Pattersons inquired about the well, Mr. McKnight told them, innocently but falsely, that the sellers did not know whether it was a good well or not. Under the circumstances, we are convinced that Bodenhamers acted intentionally, and that as a result of their deliberate withholding of information from McKnight, the Pattersons received an incomplete and misleading answer to their inquiry. We hold that there was a deliberate misrepresentation and that it was material.

██ Bodenhamers argue that even if we find there was a misrepresentation, Pattersons were not entitled to rely on it. They quote in their brief the following from

*Miller v. Protrka,* 193 Or 585, 598, 238 P2d 753 (1952):

> "A purchaser must use reasonable care for his own protection and cannot rely blindly upon the seller's statements but must make use of his means of knowledge and, failing to do so, cannot claim that he was misled."

The holding in that case was that a knowledgeable buyer was not entitled to treat mere "puffing" or "dealers talk" as a representation of fact. We held, in other words, that there had been no misrepresentation. Since *Johnson v. Cofer,* 204 Or 142, 281 P2d 981 (1955) this court has consistently held that a purchaser who has, in fact, been induced to enter a contract by an intentional misrepresentation may rescind the contract even though his reliance may have been negligent. *See, e.g., Heverly v. Kirkendall,* 257 Or 232, 237, 478 P2d 381 (1970); *Farnsworth v. Feller,* 256 Or 56, 63-64, 471 P2d 792 (1970); *Furtado v. Gemmell,* 242 Or 177, 182, 408 P2d 733 (1965); *Dreifus Lbr. Co. v. Werner,* 221 Or 467, 473-74, 351 P2d 684 (1960).

■■ Nevertheless, Bodenhamers contend, there could be no reliance on any misrepresentation about the well because the contract of sale expressly provides:

> "It is understood between Seller and Buyer that the well on the property is not guaranteed by the Seller."

We do not agree. An understanding that the well is "not guaranteed" is not equivalent to an agreement that the buyer takes the risk of there being no well at all. Having been led, falsely, to believe that the sellers knew nothing about the well, Pattersons were not put on notice of any different state of affairs by this refusal to guarantee. A party to a contract may not insulate himself from the consequences of a fraudulent misrepresentation by merely refusing to "guarantee" its subject matter.

■ Bodenhamers now contend, for the first time, that even if there were grounds for rescission, Pattersons did not act promptly enough and are not, therefore, entitled to rescission. Pattersons did not give notice of

rescission until after the suit for foreclosure was filed, approximately seven months after they learned the well was dry. During this period they located and moved to another residence, sought the assistance of the Real Estate Commissioner, and sought legal advice. They made no payments on the contract. Mrs. Patterson testified that as soon as they learned the well was dry they stopped all work on the property. We have found no evidence that during the period before they gave formal notice of rescission they did anything inconsistent with an intention to disaffirm the contract. As we noted in *Brown v. Hassenstab,* 212 Or 246, 256, 319 P2d 929 (1957):

"* * * The duration of time between discovery of the fraud and the purported disaffirmance is one factor evidencing a prior election to take one course or the other. The importance of this factor as well as others, such as the continued receipt of benefits under the contract, the performing of obligations under the contract, or, more generally any act indicating an intention to abide by the contract, will depend upon the facts of the particular case."

In the present case the delay was a long one. We believe, however, that it was adequately explained by the Pattersons' difficulties in obtaining legal advice, and that explanation is not refuted by any conduct on their part indicating an intention to affirm the contract. In most, if not all, cases holding an attempted rescission untimely we have found conduct inconsistent with an intention to rescind. *See, e.g., Edwards v. Wilcoxen,* 278 Or 91, 562 P2d 1207 (1977) (purchasers continued to operate business and advertised the property for sale); *Hay v. Pacific Tastee Freez, Inc.,* 276 Or 569, 555 P2d 1256 (1976) (purchasers continued to operate business and executed new related agreements with sellers); *Watson v. Fantus,* 275 Or 605, 552 P2d 251 (1976) (buyer remained in possession, made substantial expenditures for improvements, and negotiated for extra time to make payments); *Nimrod Park, Inc. v. Rose,* 265 Or 221, 508 P2d 183 (1973) (buyers remained in possession and

continued to make payments); *First West M'tgage v. Hotel Gearhart,* 260 Or 196, 202, 488 P2d 450 (1971) (joint venturer continued to act for the venture); *Miller v. Barker,* 233 Or 113, 123-26, 377 P2d 343 (1962) (buyers remained in possession, negotiated for extension of time to make payments, and listed the property for sale). In the present case there is no such evidence and, under the circumstances, we do not find the delay itself evidences any intention by Pattersons to affirm the contract.

That portion of the trial court's decree which grants Pattersons' prayer for rescission will be affirmed.

The next question is whether Pattersons are entitled to recover the expense incurred in beginning the construction of a road and in grading and levelling in preparation for installing a septic tank. The tank was never installed, and the road was never completed. Because the shale road foundation was never given its contemplated cover of gravel, little remained of the road construction by the time of the trial. Bodenhamers contended, and the trial judge agreed, that in order for Pattersons to recover their construction expense they must prove that they had made permanent and valuable improvements to the property. Finding that the incomplete construction work had added no value to the property, the trial judge held the Pattersons were not entitled to recover these expenses. Pattersons appealed from this portion of the decree.

■ When a contract is rescinded the parties should be restored, as nearly as possible, to their situations prior to the transaction. *Bridgmon v. Walker,* 218 Or 130, 135, 344 P2d 233 (1959); *McGowan v. Willamette Valley Irrigation Land Co.,* 79 Or 454, 460, 155 P 705 (1916). When this can be accomplished by requiring each party to give up what was received under the contract, the application of this principle creates no problem. However, where the circumstances are such that both parties cannot be restored to their original

positions, there will frequently be difficulties, because one party may have to suffer a loss if the other is to be made whole. It has been said to be the general rule that upon rescission of a contract for the sale of land, an allowance for improvements is measured by the amount by which they have increased the value of the property. *See 3 Black on Rescission and Cancellation* § 636 (2d Ed 1929). On the other hand, we find the following in McCormick, *Damages* 458 (1935):

> "When the person defrauded has made expenditures as a result of the fraud, which were reasonable under the circumstances, these may ordinarily be recovered, so far as they have been rendered fruitless because of the deceit. In rescission, the plaintiff's expenditures under the transaction are naturally recoverable, * * *"

None of our own cases is directly in point. In *Farmer v. Groves,* 276 Or 563, 555 P2d 1252 (1976), we held that the rescinding purchasers could not recover for work they did on the house and yard prior to the seller's wrongful declaration of a forfeiture, because there was no evidence that their work had enhanced the value of the property. The purchasers in that case contended that their labor and materials had, in fact, added to the value of the property. They did not contend, as the Pattersons do in this case, that even if no value was added they were entitled to be reimbursed for their out-of-pocket expenses.

■ We do not propose to attempt to reconcile the many cases from other jurisdictions. The diversity of authority is, at least in part, a result of the varied factual situations faced by the courts. We hold, simply, that where rescission is based on fraud, and where the innocent party, before discovering the fraud, has made reasonable expenditures in reliance on the bargain, those expenses may be recovered upon rescission.

■ Bodenhamers point out that because the property has not been made more valuable, they have not been unjustly enriched. Where improvements made by an innocent party have added more to the value of the property than the amount expended, the added value

[ 377 ]

may be the proper measure of recovery to prevent the guilty party from profiting by his own fraud. However, where the expenses are, although reasonable, greater than the resulting increase in value, the rescinding purchaser should be entitled to recover in full. We agree with the reasoning in *Utemark v. Samuel,* 118 CalApp2d 313, 257 P2d 656, 659 (1953):

> "It appears to have been the purpose of the court to place the *defendants* in *status quo* regardless of any loss *plaintiffs* might suffer, but it was the plaintiffs, not the defendants, who were entitled to be restored to their former position. This is the purpose of rescission. Equity is solicitous that the innocent party who rescinds be not made to suffer. It exercises no such solicitude for the wrongdoer who has brought about a situation in which one or the other must lose.* * *" (emphasis in original)

■ Pattersons presented evidence of expenditures of at least $2933.47 for work in connection with the road and other work on the site.[3] It is not suggested that this amount is not reasonable. The trial court's decree must be modified to provide for recovery by Pattersons in this amount to reimburse them for their reasonable construction expenses.

■ Finally, Pattersons contend that the trial court erred in denying their request for attorney fees. This was not error. Their claim for attorney fees is based on a provision in the contract of sale. By asking for rescission of the contract, they disaffirmed it in its entirety. They may not avoid the contract and, at the same time, claim the benefit of the provision for attorney fees. *Pickinpaugh v. Morton,* 268 Or 9, 519 P2d 91 (1974).

The trial court's decree is modified in accordance with this opinion and, as modified, is affirmed.

---

[3]This figure includes amounts of documented expenditures, but does not include additional payments to which Mrs. Patterson testified, but which were not supported by documentation.