Argued February 8, reversed and remanded May 30, 1979

# MEADER,
*Respondent/Cross-Appellant.*
## *v.*
# FRANCIS FORD, INC.,
*Appellant/Cross-Respondent.*
## (No. 423-496, SC 25603)
### 595 P2d 480

David W. Dardano of Dardano & Mowry, Portland, argued the cause and filed briefs for appellant/cross-respondent.

Richard O. Nesting, Portland, argued the cause and filed a brief for respondent/cross-appellant.

Before Holman, Presiding Justice, and Howell, Lent, and Linde, Justices.

HOLMAN, J.

**HOLMAN, J.**

Plaintiff, the purchaser of a used truck, requested damages against the seller, an automotive dealer, in two causes of action. The first was for a breach of warranty in the sale of the truck and the second was for deceit arising out of a claimed misrepresentation concerning purported repair of the truck subsequent to the sale. An order of involuntary non-suit was granted by the trial court on the warranty cause of action, and the deceit cause of action was submitted to the jury which returned a verdict for plaintiff. Defendant appealed from the judgment entered pursuant to the verdict and plaintiff cross-appealed.

■ Defendant's first assignment of error is the failure of the trial court to grant its motions for a judgment of involuntary non-suit and a directed verdict on the deceit cause of action. The basis for its motions was a claimed insufficiency of evidence of deceit. The evidence will be recounted in a manner most favorable to plaintiff as is proper after a judgment entered on a jury verdict in his favor.

At the time plaintiff purchased the truck, he signed a disclaimer of any warranty which was as follows:

"It is understood that Francis Ford Inc. of Oregon, will not be bound by any understanding, agreements or representations expressed or implied, not specified herein and this agreement is not valid until properly countersigned and accepted. Used cars sold on an as is basis unless otherwise specified."

However, plaintiff testified as follows:

"Q   Did you have any additional discussions with Mr. Newman concerning any warranties, et cetera?

"A   Other than—Mr. Newman—when I signed the contract, or after I signed the contract, I asked Mr. Newman about warranty, and he said at that time, we have no warranty as such, but if anything happens we will work with you and get it repaired. He said, we've done it in the past and we will continue to do it.

"* * * * *.

[453]

"Q (By Mr. Nesting) Was there any other particular statements made by Mr. Newman to you concerning what they would do to the truck if there was any mechanical problem?

"A Well, he said if there was any mechanical problems, that we could get together and work it out.

"Q Okay. And what did that mean to you?

"A Well, to me, that meant that they were going to stand behind the truck.

"* * * * *.

"Q (by Mr. Dardano) Sure. Mr. Meader, you understood that if something went wrong with this truck, Mr.Newman would help you out on it?

"A Yes.

"Q That's your testimony. As far as you were concerned, that's all the testimony?

"A Yes."

Shortly after plaintiff purchased the truck, plaintiff experienced difficulty with its motor and complained to defendant. Defendant directed plaintiff to take the vehicle to a truck repair firm which thereafter dealt exclusively with defendant concerning the particular repairs required. The repair firm first advised defendant of a cam-shaft problem, at which time defendant contacted plaintiff and requested plaintiff to contribute one-half of the cost of repairs. Plaintiff agreed to this arrangement. In the process of making the repairs, it was discovered there was a crack in the engine block of which defendant was notified. Defendant directed the truck repair firm to "lock-tite" the cracked block. There was testimony that this was an unsatisfactory method of repair and that the only real cure was to replace the block, which would have been quite expensive. After the repairs were made the truck was delivered to defendant, and plaintiff picked up the repaired vehicle there. At that time defendant told plaintiff everything "was fine" and "was in perfect running order," but it did not tell him of the cracked block. Defendant paid the entire cost of repairs.

The repair of the block was unsuccessful, and within a short time plaintiff was required to install

another motor in the vehicle. This action was brought to recover the cost of repairs plus plaintiff's loss of profits and punitive damages.

Plaintiff alleges in his complaint as follows:

"III

"That on or about September 17, 1975, plaintiff notified defendant that the said 1971 Kenworth Tractor was leaking oil, and defendant thereupon undertook the repair of said tractor. Prior to or during the course of repairs, defendant discovered that there was a crack in the engine block.

"IV

"That on or about September 25, 1975, by and through its sales manager, an employee acting within the scope and course of his employment, the defendant represented to the plaintiff that the 1971 Kenworth Tractor had been completely repaired and was ready to be used by plaintiff. Defendant failed to disclose to the plaintiff the fact that the 971 Kenworth Tractor was defective with a cracked engine block at a time when defendant knew that the block was cracked."

Plaintiff does not contend that there was any fraud in the inducement of the contract or that when defendant made the contract it had no intention of performing it. He does not contend that defendant knew of the defect at the time of the sale or even that the defect existed at that time and admits defendant told him it knew nothing of the truck's past history. In his brief plaintiff states:

"Here, the fraud was independent of the contract. Plaintiff's reliance was not in entering or performing the contract, but in taking the truck on the road instead of having it repaired properly."

Plaintiff's contention is that whether or not defendant had an obligation to repair the truck is irrelevant to his deceit cause of action for loss of profits because defendant undertook to have the truck repaired, it did not do so, and it knowingly misrepresented that it had done so to plaintiff's damage. Plaintiff testified that had the misrepresentation not been made concerning

repairs to the truck, he would have had it properly repaired himself and not have suffered the loss of his hauling contract and resulting damages.

■■ The typical case of deceit is one in which the plaintiff has parted with something of value in reliance upon a defendant's misrepresentation. This is not that kind of a case. Plaintiff's claim for loss of profits does not rest upon an obligation by defendant to replace the cracked block resulting from a misrepresentation of the truck's condition at the time it was sold or from an agreement at the time of sale to "work it out" if repairs were necessitated. It rests upon defendant's misrepresentation of the condition of the truck (and failure to disclose its known condition) after defendant undertook to have it repaired and plaintiff relied upon that misrepresentation to his damage. It is not necessary that deceit be founded upon a contract. Deceit is founded upon knowledge of the falsity of the representation and the intention to mislead. Prosser, Law of Torts 685, § 105 (4th ed 1971). The jury could have found that defendant knew the truck was improperly repaired and defendant intended to mislead plaintiff concerning its condition in order to avoid the controversy which would result if plaintiff made a claim for all or part of the cost of replacing the engine block.

■ The elements of a cause of action for deceit involve a false representation of fact by defendant which is made with knowledge of its falsity (or its equivalent, knowing lack of knowledge) and with the intention to induce plaintiff to act or to refrain from acting in reliance thereon. The representation must be justifiably relied upon by plaintiff in taking action or in refraining from it to his damage. Evidence of all these elements would appear to be present in this case. Defendant claims it had no legal duty to disclose the true condition of the vehicle. It had a duty not to knowingly mislead plaintiff to his detriment.

[456]

■ Defendant also contends there was insufficient evidence of loss of profits in the amounts submitted to the jury for its consideration. Plaintiff's claimed loss of profits resulted from his inability to complete hauling which a man by the name of Gift had undertaken and which had been farmed out to plaintiff by Gift because Gift lacked enough trucks to handle the work at that time. The testimony of loss of profits was as follows:

"Q   Okay. Now, prior to your breakdown, you testified that you were on a hauling contract from—Mark Gift, was it?

"A   Yes, from Mark Gift.

"Q   And where was the hauling from?

"A   It was from Baker, Oregon, to Redmond, Oregon. We'd been on the job for approximately two weeks and expected it to last all winter, or until about June.

"Q   Okay. And how many—how much were you paid for each run?

"A   It was $250 a trip, and I was making six trips a week.

"Q   Okay. And what were you hauling?

"A   Veneer.

"Q   Okay. And what portion of your income do you average out, say, over the last five years for operating expenses?

"A   Operating expense—normal operating expense runs just about one-third.

"Q   And what are some of the factors that go into the operating expense?

"A   Fuel, oil, normal maintenance, license, PUC's, just—

"Q   Insurance?

"A   Insurance.

"Q   Generally anything that comes along?

"A   Pardon?

"Q   Is the one-third operating expense: This is more or less your average?

"A   Yes.

"* * * * *.

[457]

"Q His [Gift's] trucks were unavailable?

"A That's right.

"Q How many trucks does he have?

"A Five.

"Q They were—none of them were available?

"A No, sir.

"Q And none of them—

"A Not at that time.

"Q And none of them would have been available until after June?

"A Well, possibly they would have. I don't know. But at that time, he gave me the job, and—

"Q And then when you were broken down, he gave the job to someone else?

"A No, sir. He didn't give the job away. The mill did.

"Q The mill did? I see.

"A In other words, he lost the job, too."

There was submitted to the jury loss of future profits in the sum of $22,349.96, which was computed on the testimony of $250 a round trip until June less one-third of the gross amount plaintiff earned during that time as operating expenses. It is our conclusion that the proof here was too indefinite. Assuming, but not deciding, that there was sufficient evidence of plaintiff's expenses,[1] there was insufficient evidence of the probability of the continuation of plaintiff's hauling job until June. Evidence of plaintiff's and Gift's expectations is an inadequate basis upon which to submit to the jury the length of his employment. In addition, the question concerning the future availability of one of Gift's trucks and what would occur if one became available was left unanswered. Under the present proof the only loss of profits which should have been submitted to the jury was the amount plaintiff would have earned during the length of time in which it was reasonable for him to have his truck repaired. There was conflicting evidence on this issue.

---

[1] This is doubtful. *See Verret v. Leagjeld,* 263 Or 112, 115, 501 P2d 780 (1972).

The above error is sufficient to require a new trial because the jury returned a general verdict. The other assignments of error as well as the assignment of error upon cross-appeal concern matters that are not vital to a cause of action and which may or may not arise upon retrial; therefore, they do not require our present consideration.

The judgment of the trial court is reversed and the case is remanded for a new trial.