Argued and submitted December 14, 1984, affirmed as modified June 5, reconsideration denied September 13, petition for review denied November 26, 1985 (300 Or 332)

# GEARHART,
## *Appellant,*

*v.*

# GOEHNER et ux,
## *Respondents.*

## (21-060; CA A29958)

701 P2d 461

Magar E. Magar, Portland, argued the cause and filed the briefs for appellant.

Timothy J. Murphy, and Walter H. Grebe, Portland, argued the cause for respondents. With Walter H. Grebe on the brief were Grebe, Gross, Peek, Osborne & Dagle, P.C., Portland.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

ROSSMAN, J.

## ROSSMAN, J.

Plaintiff brought this action seeking specific performance of an installment land sale contract. Defendant Martin Goehner filed a counterclaim seeking rescission on the ground of misrepresentation.[1] The trial court entered a judgment allowing rescission and restitution, and plaintiff appeals. On *de novo* review, we modify the judgment.

On August 17, 1980, plaintiff and defendant entered into an earnest money agreement for the sale of a house divided into two rental units, and a building, part of which held a convenience grocery store called Jiffy Market. On September 3, 1980, they entered into an earnest money agreement for the sale of plaintiff's market business, which included gasoline sales. Defendant bought the properties primarily to remodel the unused part of the building and to operate a restaurant in it. He purchased the grocery business expecting that its profits would help him support the contract payments. Defendant began remodeling the building in September, even though the transaction did not close until October 24, 1980, when the installment contract was signed.

Just before closing, defendant became concerned with his ability to make the contract payments. He asked Fay Priss, the real estate agent involved in the transaction, to arrange a meeting with plaintiff in order to examine the market's books and records. Priss, in turn, called her broker, Wallace, who arranged a meeting with plaintiff to take place that day at the market. All parties understood that the purpose of the meeting was to assess the profitability of the business.

When defendant arrived, he was informed by plaintiff that the books and records were unavailable. Defendant testified that in response he proclaimed an end to the meeting and the entire transaction but that he was then persuaded by Wallace to remain and listen to plaintiff's information about the business.

Plaintiff had just finished tallying the previous week's sales of groceries and gasoline. He handed the tally

---

[1] Although Ella Goehner joined in the counterclaim, all references to the defendant will be to defendant Martin Goehner.

sheet to defendant, who sat down to do some computations. Plaintiff stood behind him and observed. Defendant first multiplied the week's sales figures by four to arrive at a monthly figure for groceries and gasoline. Defendant testified that he then asked for and received from plaintiff percentage figures, known as gross profit margin, that could be applied to the sales totals for groceries and gasoline to determine gross profit. Plaintiff testified that he was asked for and offered the markup percentage on the cost of the goods sold.[2] It is certain, however, that plaintiff had supplied to defendant only the sales figures, not the cost of the goods sold. Defendant testified that plaintiff represented the gross profit margin to be 30 percent for groceries and 25 percent for gasoline, although the actual gross profit margin was 25 percent for groceries and 15 percent for gasoline. Plaintiff testified that he represented those figures as markup percentages; as such, they are fairly accurate.

In any event, defendant applied those percentages to the sales figures to arrive at a monthly gross profit for groceries and gasoline. Defendant then asked for and received the market's monthly operating expenses. Defendant subtracted those expenses from the gross profit to obtain a net profit of $5,171 per month. (During 1980, until the time of this transaction, the market had actually been averaging $1,400 net profit per month.)

Defendant then deducted from his calculated figure the total monthly payments on the purchase of the property and the lease payments for some of the equipment, resulting in a positive cash flow of $2,501 per month. Plaintiff then told defendant that the rental house had two apartments and that the rent totalled $450 per month. Thus, defendant concluded that he would have approximately $3,000 per month to live on.

The tally sheet with defendant's computations was handed back to plaintiff. Defendant testified that plaintiff then said, "Yes, this is okay." Plaintiff testified that he said either "It looks fine to me" or "It looks fine to him." His

---

[2] The difference is significant. For example, if goods that cost $100 are sold for $150, for a gross profit of $50, the markup is 50 percent and the gross profit margin is 33 percent. Thus, if one mistakenly applied the markup percentage to the sales figure, the gross profit would be incorrectly inflated to $75. That is the mistake plaintiff claims was made by defendant.

concerns allayed, defendant decided to complete the transaction.

The installment contract was signed on October 24, 1980, and on the next day defendant began to operate the market. Within two to three months defendant became concerned that the market was not producing the anticipated income. Testimony by a third party indicates that in February defendant raised this issue with plaintiff who reaffirmed the figures given and computations made during the meeting in the grocery store. On March 1, 1981, defendant opened the restaurant. Later in March, defendant asked his accountant to analyze the market's operations, and his accountant expressed reservations. Defendant then sought legal advice and was advised to withhold further contract payments. During April and May, defendant and plaintiff attempted to meet to resolve their problems. Finally, on May 28, 1981, a meeting was arranged between them and their attorneys to look for a solution. They failed to reach an accord. On July 1 plaintiff filed his action for specific performance, and on July 2, defendant gave notice of rescission.

Plaintiff's five assignments of error raise the following issues: (1) did defendant prove by clear and convincing evidence that plaintiff misrepresented the market's profitability, either innocently or intentionally; (2) did defendant justifiably rely on plaintiff's representations in making his decision to purchase the property; (3) if there was a misrepresentation, did defendant, after discovery, promptly rescind the contract; (4) if the misrepresentation established was innocent, does the merger clause in the contract preclude relief; (5) should the contract have been partially rescinded; (6) if rescission is allowed, are defendant's losses on equipment and costs for labor and material recoverable; (7) for purposes of setoff, should the trial court have reopened the case to allow plaintiff the opportunity to present evidence on the market's rental value and on the diminution in the value of its inventory; and (8) as part of an equitable judgment, may a trial court impose an equitable lien on the interest of a contract vendee.

■       Plaintiff contends that he made no false representations during the meeting in the office of the grocery store. However, he testified that, when he was handed defendant's

worksheet, he affirmed, or at least did not dispute, its erroneous conclusion that the market netted approximately $5,000 per month, even though he knew that the market did not generate a net profit close to that amount. It is not necessary to discern plaintiff's precise words. If he said "It looks fine to me," he affirmatively misrepresented the market's net monthly profit, and if he said, "It looks fine to him," he implicitly misrepresented the profit, because plaintiff had, at that time, a duty to clarify defendant's misapprehension. *See, e.g., Heise et ux v. Pilot Rock Lbr. Co.,* 222 Or 78, 89-92, 352 P2d 1072 (1960); *Caldwell v. Pop's Homes, Inc.,* 54 Or App 104, 113, 634 P2d 471 (1981); *Williams v. Collins,* 42 Or App 481, 490, 600 P2d 1235 (1979); *Paul v. Kelley,* 42 Or App 61, 65, 599 P2d 1236 (1979); Prosser and Keeton, The Law of Torts, § 106 (5th ed 1984). We conclude that plaintiff intentionally misrepresented the market's profitability.

■　　We are presented, therefore, with plaintiff's contention that defendant was not justified in relying on plaintiff's misrepresentation. That contention is based on the uncontroverted testimony of Priss, which indicates that plaintiff warned defendant "that a tape of any one particular week would not be indicative of what [the market] would do the rest of the year" and that "he couldn't guarantee what was going to happen when anybody else ran it."

Plaintiff's contention is flawed for two reasons. First, defendant's claim relates to plaintiff's misrepresentation of the immediate past profitability of the market. As to that misrepresentation, plaintiff's disclaimers about the future performance of the business are immaterial. Having been led falsely to believe that the market netted approximately $5,000 per month, defendant was not put on notice as to any different state of affairs by those disclaimers as to future performance. Second, even if we assume that plaintiff's warnings should have alerted defendant against drawing any conclusions about the market's past profitability, plaintiff cannot depend on those warnings to defeat defendant's claim for rescission.

> "A purchaser who has, in fact, been induced to enter a contract by an intentional misrepresentation may rescind the contract even though his reliance may have been negligent." *Bodenhamer v. Patterson,* 278 Or 367, 374, 563 P2d 1212 (1977).

*See also Hampton v. Sabin,* 49 Or App 1041, 1049-50, 621 P2d 1202 (1980). Thus defendant has established his claim of intentional misrepresentation. We turn, therefore, to the question of whether defendant waived his right to assert his claim by failing to rescind the contract promptly.

What constitutes prompt rescission depends on when the rescinding party became reasonably certain of the misrepresentation and whether it thereafter continued to treat the contract as viable for any considerable length of time. *See, e.g., McDonald v. Shore,* 285 Or 151, 157, 590 P2d 218 (1979); *Bodenhamer v. Patterson, supra,* 278 Or at 375; *Brown et ux v. Hassenstab, et ux,* 212 Or 246, 254-56, 319 P2d 929 (1957); *Hampton v. Sabin, supra,* 49 Or App at 1052.

Defendant was in possession of the property from October 24, 1980, to June 30, 1981. There is some evidence that in December, 1980, defendant became concerned with the market's performance. There is no evidence, however, that defendant was suspicious of plaintiff's representations until February, 1981, when he raised the issue with plaintiff, and plaintiff reaffirmed his representation and appeased defendant's concerns. There is no indication, therefore, that defendant became reasonably certain that he had been defrauded until March, when he asked his accountant to analyze the market's operations and his accountant expressed concern about the market's ability to generate the profits represented.

In April, defendant obtained an attorney and sought to meet with plaintiff to resolve their dispute. Plaintiff, however, delayed this meeting until May 28, 1981. At that meeting the parties attempted, but failed, to resolve their dispute. Defendant abandoned the property on June 30 and gave notice of his rescission on July 2.

From the time in March when defendant became reasonably certain that he had been defrauded until July 2, his conduct consistently indicated an intent to disaffirm the contract. He halted contract payments and attempted to negotiate new contract terms. Defendant rescinded in approximately one month, after it became clear that no accord was possible. That was not a significant delay. *Bodenhamer v. Patterson, supra; Hampton v. Sabin, supra.*

We conclude that, because defendant protested

promptly after becoming reasonably certain that he had been defrauded and then entered into good faith but ultimately fruitless negotiations for a settlement, his claim for rescission filed promptly thereafter was not too late.

■ Because we have concluded that the misrepresentation was intentional, no clause in the contract can prevent defendant from relying on the misrepresentation to bring a suit for rescission. *Wilkinson v. Carpenter*, 276 Or 311, 314, 554 P2d 512 (1976). Therefore, we do not address the issue of whether the contract's merger clause would prevent defendant from relying on an innocent misrepresentation to bring a suit for rescission. *Cf. Wilkinson v. Carpenter, supra* (buyers could not rely on innocent misrepresentations to rescind a contract which contained a clause excluding prior warranties and declaring that there had been no representations made which induced buyers to purchase the property).

■ Plaintiff bases his argument for partial rescission on the premise that the contract is divisible, because it incorporated two agreements supported by independent consideration: one for the sale of the real property and one for the sale of the grocery business. *Cf. Pickinpaugh v. Morton*, 268 Or 9, 17-19, 519 P2d 91 (1974) (claim for attorney fees denied, because it was based on the rescinded contract; partial rescission unwarranted, because the attorney fees provision was not supported by independent consideration).

Plaintiff's premise is faulty. The parties may have allocated the consideration to different components of the entire transaction, but they did not conceive of the consideration as independent. In fact, the grocery store business was purchased for the purposes of supporting the contract payments for the entire transaction and of providing a living income for defendant. Because the contract is not divisible, partial rescission is an inappropriate remedy. *Pickinpaugh v. Morton, supra.*

■ The purpose of a restitutionary award after the rescission of a contract is to restore both parties to their former positions. *Bodenhamer v. Patterson, supra*, 278 Or at 376. However, when both parties cannot be restored, the innocent party who rescinds is entitled to be restored to his former position. Thus,

"[w]here rescission is based on fraud, and where the innocent party, before discovering the fraud, has made reasonable expenditures in reliance on the bargain, those expenses may be recovered upon rescission." *Bodenhamer v. Patterson, supra,* 278 Or at 377.

Plaintiff first contends that the restitutionary award of $58,834.89 is improper, because it does not represent reasonable expenditures in reliance on the bargain for the grocery store business. The award represents defendant's labor and his material and equipment costs in opening the restaurant. Plaintiff's contention is misplaced, however, because it relies on the premise rejected above, which is that the contract is divisible. The appropriate inquiries are whether the expenditures were made in reliance on the entire bargain and whether they were reasonable.

■■ Plaintiff's second contention presents the first part of this inquiry. He states that it was improper to allow the recovery for 360 hours of labor by defendant before the misrepresentation, because it was not expended in reliance on the bargain. The phrase "expenditures in reliance on the bargain" has the same meaning as the phrase "expenditures made as a result of the fraud." *Bodenhamer v. Patterson, supra,* 278 Or at 377-78; McCormick, Damages 449 and 458 (1935). Therefore, only reasonable expenses incurred after the misrepresentation are recoverable on a claim for rescission. Although previous expenses could be recovered on a claim of unjust enrichment, defendant does not present that claim. Accordingly, it was error to allow recovery for the 360 disputed hours expended by defendant before the fraud.

■ The expenditures after the fraud, however, are recoverable unless they were unreasonable, as plaintiff next contends. Plaintiff argues that it was unreasonable to expect the market business, even as represented, to finance expenditures of approximately $60,000. This argument misplaces the focus of the reasonableness inquiry, which goes to whether the expenditures were improvident or reckless with respect to a task undertaken as a consequence of the contract. *See Utemark v. Samuel,* 118 Cal App 2d 313, 257 P2d 656, 659 (1953) (cited with approval in *Bodenhamer v. Patterson, supra*). There was, however, no evidence of such improvidence or recklessness, and in the absence of such evidence we must

assume that defendant acted reasonably and in good faith. This conclusion is reinforced by the fact that the parties knew that the construction and operation of a restaurant was defendant's central purpose in entering into the contract.

■ Finally, plaintiff contends that defendant did not sustain his burden of proving his expenditures. Defendant, however, testified that the time he spent was reasonable and necessary and that $15 per hour was a reasonable charge for his time. That evidence was not contradicted. Defendant also submitted evidence on what he spent for material and equipment and what he lost on its resale. No evidence was submitted to show that the purchase or resale prices were unreasonable. Therefore, we conclude that defendant proved that his expenditures were made in reliance on the bargain and were reasonable. Accordingly, they are recoverable to the extent that they were incurred after the fraud.

The next issue is whether the trial court should have reopened the case to allow evidence of the market's reasonable rental value and of the reduction in value of the market's inventory. In a judgment for rescission, those damages are appropriate setoffs.

■ ■ A trial court's order refusing to reopen will be reversed only on a showing of abuse of discretion. *Arbogast et al v. Pilot Rock Lbr. Co.*, 215 Or 579, 595, 336 P2d 329 (1959). Plaintiff was not denied the opportunity to present his evidence at trial, and he claims no circumstances that prohibited its presentation. We conclude, therefore, that the trial court did not abuse its discretion in denying plaintiff's motion to reopen.

■ ■ Plaintiff finally argues that the trial court erred in imposing an equitable lien on his property interest as a contract vendee. However, courts of equity may impose equitable liens on property to effect an equitable conclusion to litigation. *First Nat. Bk. v. United States F. & G. Co.*, 127 Or 147, 162, 271 P 57 (1928). We conclude that the trial court's order imposing an equitable lien was not erroneous.

Defendant is entitled to rescission of the contract and restitution of all reasonable expenses incurred as a result of

the fraud. Those expenses, however, do not include defendant's labor before the fraud. Therefore, the restitutionary award is reduced by $5,400.

Judgment for defendant is modified to reduce restitutionary award by $5,400 to $53,434.89; affirmed as modified.