Argued and submitted October 26, 1987, affirmed on appeal and reversed on cross-appeal May 18, reconsideration denied August 12, petition for review allowed September 14, 1988 (306 Or 660)
See later issue Oregon Reports

JOHN DEERE COMPANY,
*Respondent - Cross-Appellant,*

*v.*

EPSTEIN,
*Respondent - Cross-Respondent,*

HADDIX,
*Appellant - Cross-Respondent.*

(35203; CA A36833)

755 P2d 711

Brian J. MacRitchie, Bend, argued the cause for appellant - cross-respondent. With him on the brief was MacRitchie & Lewis, Bend.

Dennis J. Heil, Portland, argued the cause for respondent - cross-appellant. With him on the brief was Janice M. Stewart and McEwen, Gisvold, Rankin & Stewart, Portland.

Terrance O'Sullivan, Bend, waived appearance for respondent - cross-respondent.

Before Warden, Presiding Judge, and Joseph, Chief Judge,* and Richardson, Judge.

WARDEN, P. J.

Richardson, J., concurring in part; dissenting in part.

---

* Joseph, C. J., *vice* Young, J., deceased.

## WARDEN, P. J.

Defendant Haddix appeals from a judgment entered against him on a claim for fraud. He contends that the trial court erred in ruling that his discharge in bankruptcy was not available as a defense and in holding that there was clear and convincing evidence of fraud. On cross-appeal, plaintiff contends that the trial court erred in awarding defendant Epstein attorney fees pursuant to ORS 20.096. We affirm on the appeal and reverse on the cross-appeal.

In July, 1981, Epstein purchased a tractor manufactured by plaintiff from Bend Turf and Tractor, Inc., where Haddix worked as a salesman. Epstein dealt with Haddix during the transaction. He made a down payment and financed the balance of the purchase price through plaintiff. Plaintiff received a retail installment contract which showed Epstein as the purchaser and debtor with both his name and Haddix's signed at the bottom. Epstein made all required payments on the equipment until May, 1982, when he defaulted. Plaintiff's repossession and sale of the tractor in January, 1983, resulted in a deficiency of $6,649.50 under the installment contract.

On December 9, 1982, Haddix filed a chapter 7 bankruptcy. The schedule of unsecured creditors listed plaintiff but showed the amount and date of the debt as "unknown" and left blank the space for description of the consideration or the basis of plaintiff's claim. Plaintiff did not file for an exception from the discharge. On February 7, 1983, Haddix received a discharge.

In September, 1983, plaintiff brought this action against Epstein to collect the deficiency owing on the contract. When his deposition was taken, Epstein denied having signed the contract. In October, 1984, after plaintiff learned of the possible forgery of Epstein's signature on the installment contract, it amended its complaint to add Haddix as a defendant on the claim for fraud in allegedly forging Epstein's signature on the contract before it was assigned to plaintiff. Haddix's answer raised his discharge in bankruptcy as an affirmative defense. The trial court ruled: "The third affirmative defense of bankruptcy does not avail Haddix in the face of this fraud claim." After trial, the court held that plaintiff could not recover against Epstein but found that the fraud

claim against Haddix had been established by clear and convincing evidence.

On appeal, Haddix contends that the trial court had no jurisdiction to determine whether plaintiff's claim against him was discharged in bankruptcy. He relies on 11 USC § 523(a)(2)(A) and (c), which give the bankruptcy court exclusive jurisdiction to except debts from discharge on the basis of the debtor's fraud. It is not clear from the record, however, what the basis was for the court's holding that Haddix's discharge was not available as an affirmative defense. That does not matter, because there is a valid basis for the court's concluding that it had jurisdiction, and it was correct in its determination that Haddix's bankruptcy discharge did not provide an affirmative defense.

In its trial memorandum, plaintiff argued:

"Defendant Haddix has alleged his discharge in bankruptcy as an affirmative defense to plaintiff's claim against him. This defense fails for two reasons. First, plaintiff had no claim against defendant Haddix at the time he filed his petition in bankruptcy, and, thus, the claim cannot be discharged. Second, even if plaintiff had a claim against defendant Haddix at the time of his bankruptcy, such claim was not listed by defendant Haddix in his bankruptcy schedules and plaintiff was not aware of such claim. Therefore, it is excepted from discharge."

■ We need only address the first argument. Without some express provision conferring exclusive jurisdiction on the bankruptcy court, concurrent jurisdiction exists between it and other courts on dischargeability issues. *Goss v. Goss,* 722 F2d 599 (10th Cir 1983); *Pares v. Pares,* 428 F Supp 1005 (ED Wis 1977). Unlike the exception from discharge for a debt based on fraud, a determination that a debt is discharged on the ground that it did not exist when the bankruptcy petition was filed is not one over which the bankruptcy court has exclusive jurisdiction. *See* 11 USC § 523. Therefore, the trial court had jurisdiction to decide the issue.

Haddix's discharge under chapter 7 was effective to discharge him "from all debts that arose before the date of the order for relief * * *." 11 USC § 727(b). "Debt" is defined by the Bankruptcy Code as "liability on a claim." 11 USC § 101(11). "Claim" is defined generally as a "right to payment." 11 USC § 101(4). However, "right to payment" is not defined,

and the question of whether a party has a right to payment against the debtor is to be determined by reference to state law. *Vanston Committee v. Green,* 329 US 156, 161, 67 S Ct 237, 91 L Ed 162 (1946); *Matter of M. Frenville Co., Inc.,* 744 F2d 332 (3rd Cir 1984), *cert den* 469 US 1160 (1985).

■ Although the alleged forgery occurred before Haddix's bankruptcy filing, the fraud claim did not exist until all of the elements of fraud had occurred, including damage to plaintiff. *See Meader v. Francis Ford, Inc.,* 286 Or 451, 595 P2d 480 (1979). There was no damage to plaintiff until, at the earliest, the tractor was repossessed and sold and a deficiency determined under the retail installment contract, which occurred in January, 1983. Because plaintiff's fraud claim had not yet come into existence as a debt at the time of Haddix's bankruptcy filing, it could not be discharged in the bankruptcy proceeding. The trial court did not err in holding that Haddix's discharge in bankruptcy was not available as an affirmative defense.

■ Next, Haddix argues that the trial court erred in finding that there was clear and convincing evidence that he had committed fraud. Haddix testified:

"Q   Do you recall a transaction in July 1981 which Mr. Epstein came to you and you negotiated with him for the purchase of a Model 2240 tractor, a 145 loader and 1650 backhoe?

"A   I do.

"Q   Weren't you the salesman handling the transaction on behalf of Bend Turf & Tractor?

"A   That is a good question. I can't tell you to be specific there was—there were two or three of us at the time.

"* * * * *

"Q   Do you recall calling [plaintiff] at the office in Portland to obtain prior approval to the proposed financing arrangement?

"A   No, I do not remember calling them.

"Q   I hand you Plaintiff's Exhibit 1, which is designated a retail installment contract. Do you recognize your signature at the bottom of that contract form?

"A   I recognize mine.

"Q   Does this refresh your recollection as to the transaction with Mr. Epstein?

"A   At this point I refuse to answer any more questions on the grounds of the Fifth Amendment."

Haddix's attorney explained to the court:

"It is clear that Mr. Haddix is being put in a position here whereby if he acknowledges he forged somebody else's signature on a document on which purports to be evidence of a debt that constitutes Forgery in the First Degree.

"If he is forced to deny it that also sets him up for prosecution for a perjury * * *."

Epstein testified that he dealt with Haddix on the transaction and that he had not authorized anyone to sign his name on the document.

Haddix contends that the only way the trial court could have found clear and convincing evidence of fraud was by drawing an adverse inference from his assertion of his Fifth Amendment right. He concedes that there is no federal constitutional prohibition against drawing an adverse inference from an assertion of the Fifth Amendment in civil cases. *See Baxter v. Palmigiano,* 425 US 308, 96 S Ct 1551, 47 L Ed 2d 810 (1976); *Brink's, Inc. v. City of New York,* 717 F2d 700 (2d Cir 1983); *Farace v. Independent Fire Ins. Co.,* 699 F2d 204, 210 (5th Cir 1983); *Cabral-Avila v. Immigration and Naturalization Serv.,* 589 F2d 957 (9th Cir 1968), *cert den* 440 US 920 (1979). He relies solely on OEC 513:

"(1)   The claim of privilege, whether in the present proceeding or upon a prior occasion, is not a proper subject of comment by judge or counsel. No inference may be drawn from a claim of privilege.

"* * * * *

"(3)   Upon request, any party against whom the jury might draw an adverse inference from a claim of privilege is entitled to an instruction that no inference may be drawn therefrom."

Haddix argues that the rule prohibits making adverse inferences from a claim of any constitutional privilege. According to the official commentary, however, the statute does not apply to constitutionally based privileges:

"Oregon Rule of Evidence 513 prohibits any comment

upon a claim of privilege, and mandates procedures to avoid any inference to a jury based on such a claim. The rule is identical to proposed Rule 513 of the Federal Rules of Evidence.

"The Legislative Assembly approves the following note of the federal advisory committee:

" '[Subsection (1).] In *Griffin v. California,* 380 U.S. 609, 614, 85 S. Ct. 1229, 14 L.Ed.2d 106 (1965), the Court pointed out that allowing comment upon the claim of a privilege "cuts down on the privilege by making its assertion costly." Consequently, it was held that comment upon the election of the accused not to take the stand infringed upon [the accused's] privilege against self-incrimination so substantially as to constitute a constitutional violation. *While the privileges governed by these rules are not constitutionally based,* they are nevertheless founded upon important policies and are entitled to maximum effect. Hence, [this subsection] forbids comment upon the exercise of a privilege, in accord with the weight of authority. 8 Wigmore, Evidence sections 2243, 2322, 2386 (McNaughton rev. 1961); McCormick, Evidence section 76 at 156 (2d ed. 1972) [citations omitted].' " Kirkpatrick, *Oregon Evidence* 199. (Emphasis supplied.)

A few paragraphs later, the official commentary also states with respect to subsection (3):

"This rule changes Oregon Law relating to comments upon and inferences from a claim of privilege that is *not constitutionally guaranteed.* Nearly all the cases involve the husband-wife privilege in a criminal trial." Kirkpatrick, *Oregon Evidence* 200. (Emphasis supplied.)

Haddix cites no authority or precedent that specifically supports his position. His reliance on *Griffin v. California,* 380 US 609, 85 S Ct 1229, 14 L Ed 2d 106 (1965), is plainly misplaced. That case merely held that, in a *criminal* proceeding, no adverse inference may be drawn from a defendant's assertion of his or her right against compelled self-incrimination. The Supreme Court held that to allow an adverse inference to be drawn in a criminal proceeding would effectively destroy the defendant's Fifth Amendment right. However, in *Baxter v. Palmigiano, supra,* the Supreme Court held

that, in a *civil* proceeding, it was permissible to draw an adverse inference from a party's claim of the same right.

The distinction between civil and criminal cases makes sense, given the purpose of the Fifth Amendment.[1] The right was intended to prohibit government officials from compelling individuals to be witnesses against themselves in criminal proceedings. It was not intended to provide a shield behind which wrongdoers can avoid civil liability for their wrongful acts.

In the face of the commentary to OEC 513 and the policies discussed, we hold that, in a civil case, adverse inferences may be drawn from a party's assertion of the Fifth Amendment right not to testify. We conclude that the evidence presented at trial, including adverse inferences drawn from Haddix's assertion of his constitutional right, was sufficient for a factfinder to conclude that fraud was established by clear and convincing evidence.

On cross-appeal, plaintiff contends that the trial court erred in awarding attorney fees to Epstein under a provision in the contract of sale, which ORS 20.096 makes reciprocal. It relies on *Bodenhamer v. Patterson,* 278 Or 367, 563 P2d 1212 (1977), where the plaintiff brought suit to foreclose a land sale contract and the defendants prevailed on their counterclaim for rescission. The Supreme Court affirmed the trial court's denial of attorney fees to the defendants:

> "[The defendants'] claim for attorney fees is based on a provision in the contract of sale. By asking for rescission of the contract, they disaffirmed it in its entirety. They may not avoid the contract and, at the same time, claim the benefit of the provision for attorney fees. *Pickinpaugh v. Morton,* 268 Or 9, 519 P2d 91 (1974)." 278 Or at 378.

The *Bodenhamer* rule is simply the corollary to the holding in *Pickinpaugh* that, when a plaintiff prevails on a claim for rescission of a contract, it is not entitled to attorney fees. *See also Niedermeyer v. Latimer,* 91 Or App 304, 755 P2d 717 (1988). Thus we proceed from the general rule that a party may not seek rescission of a contract and, at the same time,

---

[1] Haddix asserts no rights under Article I, section 12, of the Oregon Constitution.

claim attorney fees under it. In this case, Epstein succeeded on his defense of the *nonexistence* of the contract, asserting that he had never signed it. There is even less justification for an award of attorney fees in this situation than there was in *Bodenhamer*. A request for rescission presupposes that a contract does, or at least did, exist, but a defense asserting that there never was an agreement negates the very instrument upon which recovery of attorney fees is contingent.

The dissent attacks the *Pickinpaugh* rule on the same basis as Justice O'Connell's dissent in that case: In the "real world," it is likely that the parties to contracts containing attorney fees provisions intend that the losing party pay the fees, regardless of the nature of the claims. Yet, in this case, Epstein, never having been a party to the contract, could not have had such an intent. This is not even a situation in which, as the *Pickinpaugh* dissent suggests, part of the contract may be rescinded and the remainder affirmed. Epstein simply has no basis for an award of attorney fees.

The dissent's reliance on *Anaheim Co. v. Elliott,* 45 Or App 597, 609 P2d 382 (1980), is misplaced. That opinion, also written by the dissenter here, states:

"[W]e interpret *Pickinpaugh* as being inapplicable to cases like the present one which are initiated *to enforce* contracts which provide for attorney's fees. We therefore hold that the award was proper." 45 Or App at 604. (Emphasis in originial.)

That interpretation ignores *Bodenhamer* and that the action there was initiated to enforce a contract which provided for attorney fees.

We see no functional difference for the purpose of applying the *Pickinpaugh* and *Bodenhamer* rule between a defense or counterclaim to rescind an existing contract and one asserting that the defendant did not sign the contract, *i.e.,* asserting the nonexistence of the contract. In either case, the rationale for not awarding attorney fees is that, when it is determined that there is no contract, there is no basis on which to award them. *See Golden West Insulation v. Stardust Investment Co.,* 47 Or App 493, 615 P2d 1048 (1980). We conclude that the trial court erred in awarding attorney fees to Epstein.

Affirmed on appeal; reversed on cross-appeal.

**RICHARDSON, J.,** concurring in part; dissenting in part.

I disagree with the majority's holding that Epstein is not entitled to attorney fees under the contractual provision. Unlike the plaintiff in *Pickinpaugh v. Morton,* 268 Or 9, 519 P2d 91 (1974), and the counterclaiming defendant in *Bodenhamer v. Patterson,* 278 Or 367, 563 P2d 1212 (1977), Epstein did not seek a judicial nullification of the contract's existence. His "disaffirmance" was simply a defense to liability in plaintiff's action on the contract. I dissent from the part of the majority's opinion which extends *Pickinpaugh* and *Bodenhamer* to reach these facts.

The case the majority cites which is closest to the point is *Anaheim Co. v. Elliott,* 45 Or App 597, 609 P2d 382 (1980), where we held that the defendant was entitled to attorney fees under the provision for them in a mortgage which he disaffirmed. The essence of the dispute in *Anaheim* was somewhat analogous to the controversy here. The defendant resisted the plaintiff's claim for foreclosure of the mortgage, and counterclaimed for its cancellation, on the grounds that the plaintiff had fabricated the sales transaction which the mortgage putatively secured and had substituted pages in the transaction documents without the defendant's knowledge.

The reason why the counterclaim did not have to be tried was that, in rejecting the plaintiff's foreclosure claim, the court released the defendant's property from the lien of the mortgage, because it found "that there was no agreement between the parties giving rise to a mortgage." 45 Or App at 603. We concluded that the counterclaim was "effectively mooted by the dismissal of the cause of suit for foreclosure and by the court's direction that the recorded lien be expunged." 45 Or App at 604. The defendant prevailed on the plaintiff's claim through what was, in substance if not in name, a defense based on the invalidity of the mortgage under which the defendant sought and was awarded attorney fees. The factual basis for the defense was identical to the grounds for the defendant's rescission counterclaim, which was not tried. Stated otherwise, the defendant prevailed on his defense that the mortgage was a nullity rather than on his counterclaim that it was a nullity.

The majority criticizes my reliance on *Anaheim* and quotes certain language from that opinion which, read in isolation, it regards as inconsistent with *Bodenhamer.* However, the majority does not respond to the central point in *Anaheim* or to the central point of this dissent: There is a difference between a defense to an action on a contract and a claim or counterclaim through which a party seeks to have the court declare that the contract never did or no longer does exist. The majority cites no case which has applied the *Pickinpaugh-Bodenhamer* rule against a party who has done no more than raise a defense which "disaffirms" a contract. The majority does not acknowledge that, by applying the rule in that way, it is extending the rule rather than following it. Consequently, the majority offers no response to my reasons for concluding that the rule should not have the new application which the majority gives it.

It may be that, as a practical matter, a successful defense based on a contract's invalidity may leave the contract in as unenviable a posture as a successful counterclaim seeking that it be declared invalid. However, the distinction is a meaningful one in connection with what a defendant is attempting to achieve in an action and in connection with the rationale for *Pickinpaugh v. Morton, supra,* and its progeny. An invalidity defense, raised solely for purposes of avoidance, cannot result in an adjudication that the contract does not exist; if the defense succeeds, the defendant is not liable, but the existence of the contract is not directly affected by the court's judgment. The majority correctly observes that, under *Pickinpaugh* and related cases, the rationale for not awarding attorney fees is that, when a contract is declared non-existent, there is no longer a contractual provision on which to base an award of fees. Whatever merit that rationale may have when the litigation does result in a determination that there is no contract, the rationale loses much of its force when the judgment determines only the defendant's lack of liability or responsibility and not the non-existence of the contract itself.

There is far more legal fiction than reality to the notion that a contractual attorney fee provision disappears when a court rescinds or otherwise nullifies the contract. It is likely that the intent of most parties to contracts containing such provisions is that the losing party should pay the other's attorney fees in *any* litigation arising out of the contractual

relationship, regardless of the nature of the parties' claims. *See Pickinpaugh v. Morton, supra,* 268 Or at 18-19 (O'Connell, C.J., dissenting). Be that as it may, the notion that the attorney fee provision disappears becomes wholly untenable when, as here, the remainder of the contract does *not* disappear by virtue of the judgment that the defendant seeks and the court gives.

A prevailing defendant who does not seek rescission or other *relief* which negates the contract should not be treated differently for purposes of attorney fees depending on the nature of his defense. Whether the defense falls on one side of the "disaffirmance" line or the other, the defendant is obliged to go to court and defend against the plaintiff's action. When there is no counterclaim, the parties' efforts are directed entirely at prosecuting or resisting the plaintiff's claim. If the plaintiff prevails, he is entitled to attorney fees; under the majority's holding, the defendant is not entitled to attorney fees if he prevails on a defense which denies the contract rather than the breach. ORS 20.096 states a strong legislative policy favoring reciprocal rights under contractual attorney fee provisions. We should not add to the judicial erosion of that policy by extending *Pickinpaugh v. Morton, supra,* and *Bodenhamer v. Patterson, supra,* in the way that the majority does.

I respectfully dissent from the holding of the majority which this opinion discusses. I join the majority in all other respects.